IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| SUBURBAN MORTGAGE ASSOCIATES, INCORPORATED, ) | |
| Plaintiff ) | |
| ) | Civ. Action 05-856 (HHK) |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, ET AL., ) | |
| Defendants ) | |

---

**FEDERAL DEFENDANTS' CONSOLIDATED MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF MOTION TO DISMISS**

I.  **Introduction**

In August 1998, plaintiff Suburban Mortgage Associates Incorporated ("Suburban")

committed itself to providing mortgage financing in the amount of nearly $13,000,000 to the

owner of Hillside Health Center in Providence, Rhode Island ("Hillside" or "the project").  The

loan was made to finance the purchase and rehabilitation of a nursing home and was insured

against default by the Department of Housing and Urban Development ("HUD").  The owner

defaulted on its obligations under the loan less than a year after initial closing.  Four and one half

years later, in May 2004, Suburban applied to HUD for mortgage insurance benefits.

After reviewing this matter, HUD determined that in the years between the issuance of

the loan and the submission of its insurance claim, Suburban failed to take proper action to

correct multiple loan defaults or to protect HUD's interest as insurer of the loan.  To the

contrary, Suburban failed to properly notify HUD of serious defaults under the loan for more

three and one half years, and sat idly by while the project was placed into receivership.  These

otherwise inexplicable events, which benefited Hillside's owner to the detriment of HUD, can best be understood in light of the fact that the project's owner, Antonio L. Giordano, is also the 50% owner, Executive Vice-President, and a board member of Suburban.  Even more enlightening is the fact that while the HUD-insured loan was in default, the project paid various fees and monies to as many as 13 business entities controlled by Giordano.  In a single year, the project paid these companies over $900,000, providing Giordano/Suburban ample incentive to protect the interests of Giordano/Hillside, and keep cash flowing to Giordano and companies owned and controlled by him and members of his family.

HUD had no choice but to deny Suburban' claim for insurance benefits.  This decision was correct under the applicable law and under the facts of this case.  Suburban now seeks extraordinary relief from this court in the form of an injunction compelling HUD to pay it more than $1.4 million and perhaps as much as $12,000,000.  In view of its history of false promises and defalcation, the Court should not countenance such a brazen, unprecedented, and unjustified request.

Aside from the fact that it is seeking equitable relief with grossly unclean hands, Suburban has come to the wrong court.  What Suburban is really seeking here is money damages based on HUD's alleged breach of the mortgage insurance contract.  That claim, whatever its invalidity, must be heard in the Court of Federal Claims.

## II.   **Background**

### A.   **The HUD Mortgage Insurance Program.**

The National Housing Act, 12 U.S.C. § 1701, et seq. ("NHA") authorizes the Secretary of Housing and Urban Development ("HUD") to enter into "contract[s] of insurance" with eligible mortgagees ("lenders").  NHA § 203(e), 12 U.S.C. § 1709(e).  Through these contracts, HUD

insures lenders against the risk of mortgagor ("borrower) default on an insured mortgage.  The Federal Housing Administration ("FHA"), a component agency of HUD, performs HUD's mortgage insurance functions under the NHA.  The Secretary's functions under the NHA have generally been delegated to the Commissioner of FHA, who is also Assistant Secretary of Housing.[1]

A contract between HUD and an insured lender is created when HUD endorses the mortgage note for a particular project.  See 24 C.F.R. §§ 200.100 and 232.570.  The endorsement identifies which section of the NHA, and thereby which provisions of HUD's regulations are incorporated by reference into the contract of insurance.  Mortgages of nursing home properties, including mortgages obtained for the purpose of purchasing and rehabilitating nursing homes, are insured under § 232 of the NHA, 12 U.S.C. § 1715w.[2]  HUD implements § 232 of the statute through Part 232 of its regulations,[3] and through other provisions incorporated by reference into that part.[4]

An insurance contract between HUD and a lender for the purchase and rehabilitation of a nursing home is created when HUD provides its "initial endorsement" on the mortgage note for a

---

[1]  For the sake of simplicity, references in this memorandum will generally be to HUD, but the terms "FHA," "the Secretary," and "the Commissioner" will be found in quotations from documents, or when their use is significant – for example, when it is important to distinguish between actions that must be taken by the Commissioner or the Secretary and actions that may be taken by other HUD officials.

[2]  Although Section 207 of the NHA governs the insurance of loans secured by multifamily rental housing projects, subsections (d), (e), (g), (h), (i), (j), (k), (l) and (n) of section 207 are made applicable to the insurance of nursing home loans by Section 232(f) of the NHA, 12 U.S.C. § 1715w(f).

[3]  See 24 C.F.R. §§ 232.252 and 232.800(a).

[4]  Regulations applicable to loans for multifamily housing projects, contained in 24 C.F.R. Part 207, Subpart B, are made applicable to nursing home loans by 24 C.F.R. § 232.251(a).  The regulations in 24 C.F.R. Part 200, Subpart A, are made applicable to nursing home loans by 24 C.F.R. § 232.1.  Certain provisions of 24 C.F.R. Part 202, including all those cited in this memorandum, are then made applicable to nursing home loans by 24 C.F.R. § 200.10.   The loan servicing provisions of 24 C.F.R. Part 201 are then made applicable by 24 C.F.R. § 202.5(e).

particular project.  See 24 C.F.R. §§ 200.47(a)(2) and 200.100(a).   The initial endorsement allows the lender to make "insured advances" of mortgage funds to the borrower, on an incremental basis, and in accordance with HUD approval.   24 C.F.R. S  200.50.   At initial endorsement, the mortgage note will state the total amount of insured advances allowable for the purchase and rehabilitation of the property, not the amount of money actually loaned.   A loan is eligible for "final endorsement" only when the rehabilitation of the project is complete and the terms and conditions of the insurance commitment have been met to HUD's satisfaction.   At that point, HUD will review the total of all approved advances on the "credit instrument" (the mortgage document) and once again endorse the document.  24 C.F.R. 200.100(b).  Before a loan can go to final endorsement, HUD must certify that all required work has been completed "in accordance with terms, conditions, and standards established by the Commissioner[.]"  24 C.F.R. § 200.47(a)(2).  See Declaration of Joseph A. Crisafulli ("Crisafulli Dec."), attached as Exhibit D, ¶¶ 5 and 6.

For loans insured under the NHA, HUD assumes the risk of borrower default.  In some cases, the lender does not even lend its own money; instead, it issues securities in the amount of the FHA-insured mortgage and sells them to private investors.  To induce investors to purchase these securities, payment is guaranteed by the Government National Mortgage Association ("GNMA"), a wholly-owned government corporation within HUD.  GNMA guarantees are entirely separate from FHA mortgage insurance and are backed by the full faith and credit of the United States.  The lender ordinarily charges the borrower an interest rate higher than the rate paid to the GNMA investor.

Prior to closing on an FHA insured loan, the lender agrees to adhere to the terms of the mortgage insurance contract, including the NHA, HUD's regulations, and other guidance issued

by HUD.  Before HUD can issue mortgage insurance, the lender must execute a certificate at

closing which "shall certify to the Commissioner that it will conform with terms and conditions

established by the Commissioner for the *mortgagee's control of project funds*, and other

incidental requirements established by the Commissioner."  24 C.F.R. § 200.51 (emphasis

added).  The form that HUD has established for this purpose is Form HUD-2434, "Mortgagee's

Certificate."  See ¶ 14 of HUD-2434, which is attached as Exhibit A.

Since HUD is really the party at risk in these transactions, some of its regulations

establish prudent safeguards to avoid conflicts of interest.   For example:

> A mortgagee [lender] may not pay *anything of value*, directly or indirectly, in
> connection with any insured mortgage transaction or transactions *to any person or
> entity if such person or entity has received any other consideration from the
> mortgagor*, seller, builder, or any other person for services related to such
> transactions or related to the purchase or sale of the mortgaged property, except
> that consideration approved by the Secretary may be paid for services actually
> performed.  The mortgagee shall not pay a referral fee to any person or
> organization.

24 C.F.R. § 202.5(l) (emphasis added).

Lenders may retain loans they originate, or they may sell them.  If a lender retains an

originated loan, it must either service that loan or arrange for servicing in accordance with Part

201 of the regulations.  *See* 24 C.F.R. § 202.5(e).  Servicing must conform to conditions set forth

in Part 201 and to other HUD guidance.  *Id*.  Lenders are required to engage in prudent servicing

practices; they remain responsible to HUD in those efforts.  *See* 24 C.F.R. § 201.41(a).

HUD Handbook 4350.4, CHG-7 was issued on June 26, 1996 to guide lenders and

servicers in performing their servicing obligations.  A general description of the servicing

function is contained in Chapter 1 of this Handbook and Chapter 2 contains more details

concerning the servicing function.  For the convenience of the Court, a copy of both Chapters 1

and Chapter 2 of this Handbook is attached hereto as Exhibit B.[5]

Handbook 4350.4, CHG-7 explains (at ¶¶ 2-5) that, beyond the specific terms of the

insurance contract (embodying the NHA and HUD's regulations), a servicing lender has a

*fiduciary duty* to HUD.  This fiduciary duty flows out of the duty imposed by 24 C.F.R.

§ 202.5(j)(4) to act with respect to HUD-insured loans just as a prudent lender would act if *it* was

bearing the risk of loss, as well as out of the simple fact that HUD, by endorsing the mortgage

and thereby executing the contract of insurance, is effectively empowering the lender to put the

FHA insurance fund at risk.

Other HUD regulations also address mortgage servicing.  For example, interest and

principal must be paid to the servicing lender on the first day of each month, "in accordance with

an amortization plan agreed upon by the mortgagor, the mortgagee and the Commissioner."[6]  24

C.F.R. § 200.84(b)(1).   The borrower must also make equal monthly payments, in an amount

sufficient to amortize all taxes, charges and special assessments, into an escrow account

maintained by the lender.  24 C.F.R. § 200.84(b)(3).  The lender must accumulate borrower

funds in this account *before* it can collect any such funds in the form of interest.  24 C.F.R.

§ 200.84(c).  The lender is then responsible for paying property taxes and assessments as they

become due.  *See* Handbook 4350.4, CHG-7, ¶ 2-14.a., at p. 2-14.

The escrow account for taxes is only one type of escrow account that an FHA-insured

lender may be required to establish.  Another is a reserve fund for replacements.  The purpose of

a reserve fund for replacements is to save up money to help defray the costs of replacing a

---

[5]  The entire handbook may be accessed at www.hudclips.org.
[6]  In construction loans there is often an initial period during which only interest payments are
required.  The length of that initial period is subject to HUD's discretion, but is to be no longer
than is "necessary to obtain sustaining occupancy."  24 C.F.R. § 200.84(b)(1)(ii).

project's capital items.  Money is typically paid into such accounts from loan proceeds, and also

on a monthly basis out of the project's operating revenues.  See HUD Handbook 4350.1 REV-1,

Chapter 4 (copy attached as Exhibit C), for a description of how these accounts work.[7]   Like the

escrow account, the reserve fund for replacements is held by the servicing lender.

Any failure of a borrower to make a payment required under the terms of a mortgage

constitutes a default.  *See* NHA § 207(g), 12 U.S.C. § 1713(g); 24 C.F.R. § 232.830(a).  Lenders

*must* report all defaults to HUD within 30 days of the 30th day following the initial default: in

other words, within 60 days of the initial nonpayment.  *See* 24 C.F.R. § 232.850(a).[8]  Since HUD

is at risk on insured loans, the obvious purpose of this requirement is to give HUD timely notice

of any problems with the project that may require its intervention or action.  That is why 24

C.F.R. § 207.256b(a) provides that the borrower and lender can extend the time for curing a

default or modify the payment terms of the mortgage *only with the approval of the*

*Commissioner*.

Both the NHA and HUD's regulations take default very seriously.  First, Handbook

4350.4, CHG-7, at ¶¶ 2-35 through 2-47, makes it a lender responsibility to review the

borrower's financial statements carefully when the borrower is in default, to determine the cause

of the default, and to notify HUD.  See Exhibit B.  Section 207(g) of the NHA, 12 U.S.C. §

1713(g), provides that, when a default continues for 30 days, the lender becomes entitled to

receive the benefits of the mortgage insurance, provided that it assigns and delivers to the

Secretary, "within a period and in accordance with rules and regulations to be prescribed by the

Secretary," certain specified rights, monies and documents.  The 30-day period of continuing

---

[7]  The entire handbook may be accessed at www.hudclips.org.

[8]  Handbook 4350.4, CHG-7 strongly recommends that lenders report a default within 10-15 days of its occurrence.  *See* ¶ 2-37, at 2-32 – 2-33.

default that triggers lender eligibility for the benefits of the mortgage insurance contract is reiterated in 24 C.F.R. § 232.830(c).  Another regulation, 24 C.F.R. § 232.875, specifies that the election provided by Section 207(g) of the NHA must be made within "45 days after the lender becomes eligible for the benefits of the loan insurance, or within such later time as may be agreed upon by the Commissioner in writing," in other words, within 75 days after the date of the initial default.[9]  A table explaining the deadline dates is included in Handbook 4350.4, CHG-7, ¶ 2-37.

By its election to assign an insured mortgage to HUD, a lender makes the following warranties under 24 C.F.R. § 207.258(b)(2):

> (i) No act or omission of the mortgagee has impaired the validity and priority of the mortgage.
> ….
> (iii) The mortgage is prior to all liens and encumbrances which may have attached or defects which may have arisen subsequent to the recording of the mortgage, except such liens or other matters as may be approved by the Commissioner.
> ….
> (v)  The mortgagee has a good right to assign the mortgage.

The Commissioner must determine whether the lender's proffered assignment of the mortgage is "acceptable."  *See* 24 C.F.R. § 232.885(b).  As a part of that process, the lender must submit the documents, information, and funds required by 24 C.F.R. § 232.805.  After receiving these materials, HUD reviews them and determines the amount of any insurance payment due.  In the case of a loan that has not yet gone to final endorsement, HUD must certify the reasonableness of the previously approved advances.  If the lender failed to promptly report the default and to make its election within the prescribed 75-day period, it is not entitled to recover any interest that accrued after the date of the default.  24 C.F.R. § 232.885(b)(1)(v).

---

[9]  The same time limit is imposed by 24 C.F.R. § 207.258(a).

Finally, the knowledge that HUD would be the party financially at risk on insured mortgage loans led Congress to take special precautions with respect to possible fraud or misrepresentation by lenders.  *See* NHA § 203(e), 12 U.S.C. § 1709(e) (mortgage incontestable in the hands of an approved lender, except for "fraud or misrepresentation" on the part of that lender); NHA § 2(g), 12 U.S.C. § 1703(g) (insurance claims improperly paid recoverable for two years for non-fraud reasons, but at any time in case of fraud or misrepresentation).

### B.    The Insured Loan at Issue Here.

Suburban is a HUD-approved lender, authorized to apply for HUD mortgage insurance. Crisafulli Dec. ¶ 3.  The equal owners of Suburban are J. Walsh Richards, Jr. and Antonio L. Giordano.  Declaration of Cristine O'Rourke ("O'Rourke Dec."), attached hereto as Exhibit E, ¶ 4.  Suburban has three directors: Mr. Richards, Mr. Giordano, and Thomas L. Boggs, Jr.[10]  *Id*. Richards is the President of Suburban and Giordano is its Executive Vice President.  *Id*., Attachment B.  Suburban's Executive Vice President, Antonio L. Giordano, also owns a Rhode Island corporation, Consultants, Inc. ("Consultants"),[11] and owns or controls a variety of other corporations and entities, some of which will be described below.  *Id*., ¶¶ 5 and 6.

Mr. Richards states that he has "been a mortgage lender almost exclusively dealing in the FHA-insured multifamily market since 1969[.]"  Affidavit of J. Walsh Richards, Jr. in Support of Plaintiff's Motion ("Richards Dec."), ¶ 4.  (A copy of Mr. Richards' declaration, without attachments, is attached as Exhibit F for the convenience of the Court.)  Richards admits that Suburban "receives virtually 100% of its business from FHA-insured loans." *Id*., ¶ 3.  It is plain that he is quite familiar with HUD's mortgage insurance program.

---

[10]  Mr. Boggs is a principal in the law firm of Patton Boggs, LLP.
[11]  See Audit Report, Appendix C, p. 25; O'Rourke Dec., ¶ 6.a.

On December 10, 1997, Suburban filed an application for the issuance of a contract of mortgage insurance with HUD's Providence office.  *See* Crisafulli Dec. ¶ 4.  In its application, Suburban requested HUD to insure a mortgage loan that would finance the purchase and rehabilitation of the former Jewish Home for the Aged in Providence, Rhode Island.  The new owner would be a limited partnership called Hillside Health Center Associates, L.P. ("Hillside LP").  *See id.*  The general partner of Hillside L.P. is Consultants; Giordano is Hillside's sole limited partner.  *See* O'Rourke Dec., ¶ 5.d.  The lessee-operator of this project was Hillside Health Center L.L.C. ("Hillside LLC").  Hillside LLC is also owned by Antonio Giordano and members of his immediate family.  *See* Crisafulli Dec. ¶ 4.

HUD approved Suburban's application to insure this loan.  *See* Crisafulli Dec., ¶ 4.  As a condition of HUD's approval of this project for mortgage insurance, Hillside LLC was required to enter into both a lease with Hillside LP and a "Regulatory Agreement Nursing Homes" (Form HUD-92466-NHL) with HUD.  Exhibit G, attachments 9 and 11.  Section 3 of the latter agreement states:  "Payments by the lessee to the lessor shall be sufficient to pay all mortgage payments, including payments to reserves for taxes, insurance, etc., payments to the Reserve for Replacements and to take care of necessary maintenance[.]"  Thus, Hillside LLC was expected to pay Hillside LP, which in turn would pay Suburban all of the monies required under the loan documents.

At a loan closing held on August 19, 1998, Suburban executed a "Mortgagee's Certificate" on Form HUD-2434.  Exhibit G, attachment 7.  Suburban's execution of this document was a prerequisite to closing.  Crisafulli Dec., ¶ 7.

Paragraph 14 of Suburban's Mortgagee's Certificate provides, in pertinent part:

We understand that nothing herein contained or contained in the said credit instrument or Mortgage securing the same, or in the other contract documents, is

to be deemed a waiver of any of the provisions of the aforesaid HUD Regulations, but all of said instruments are intended to be subject thereto.  We hereby agree to conform with and abide by such HUD regulations in all matters with respect to the aforesaid loan and the project in so far as they are applicable to us.[12]

A Rider attached to Suburban's Mortgagee's Certificate contained, *inter alia*, the

following additional representations:

There will be no prepayment during the construction period plus ten years.
In the event of a default during the term of the prepayment lockout and/or penalty, Suburban Mortgage Associates Incorporated will:
a.  Request a three (3) month extension of the deadline prescribed by 24 C.F.R. Section 207.258[13] for filing a notice of its intention to file an insurance claim and its election to assign the mortgage ….
c.  Report to HUD at least monthly on any progress in arranging refinancing;
d.  Otherwise cooperate with HUD in taking reasonable steps to avoid an insurance claim…
f.  Notify HUD of the delinquency where a payment is not received by the sixteenth (16th) day of the month in which it is due.
Antone [sic] Giordano has an interest in the Mortgagor as revealed in the Agreement and Certificate of Limited Partnership of Hillside Health center Associates, L.P.  Additionally, he has an interest in Suburban Mortgage Associates Incorporated, the Mortgagee.  However, this transaction is an arms length transaction and neither the Mortgagor nor the Mortgagee has a controlling interest in the other.

In paragraph 13 of the Mortgagee's Certificate, Suburban certified as follows:

Beginning with the date on which the first payment toward amortization is required to be made by the terms of the insured Mortgage or at such later date as may be agreed to by you in writing, we shall require a monthly deposit with us or in a depository satisfactory to us of one-twelfth (1/12) of the sum set forth in your Commitment for Insurance constituting a "Reserve Fund for Replacements" which fund will be subject to our order and from which fund withdrawals may be made only upon the receipt of your written permission. . . .

In reliance on, among other things, the representations contained in the Mortgagee's

Certificate, HUD endorsed the mortgage note, thereby executing the contract of insurance, and

---

[12]  The words "you" or "your" in this certificate refer to HUD; the words "our" or "we" refer to Suburban.
[13]  The referenced deadline under 24 C.F.R. § 207.258(a) is the same 45-day deadline that is imposed by 24 C.F.R. § 232.875.  *See* note 9, *supra*.

the loan transaction closed on August 19, 1998.  *See* Crisafulli Dec, ¶ 7.   Suburban elected to retain the Hillside loan in its portfolio, and to service the loan itself.  *Id.*

Under the endorsed mortgage note (Exhibit G, attachment 8), amortization of principal was required to begin on August 1, 1999, slightly less than one year after the loan closing. Pursuant to paragraph 13 of the Mortgagee's Certificate, monthly payments into the reserve fund for replacements were also to begin on that date, as Suburban admits.  *See* Richards Dec. ¶ 14; copy attached as Exhibit F.

But Suburban did not require Hillside LP to make principal payments or payments into the reserve for replacements account when those payments were due.  *See* email to HUD OIG investigator Kevin Smullen from Suburban Treasurer Nguyet Pham, attachment 5 to the "Affidavit of J. Walsh Richards, Jr." in plaintiff's papers, at pp. 5 and 9 (copy attached hereto as Exhibit I for the convenience of the Court).  Suburban failed to report these defaults to HUD. *See* Exhibit F ¶ 16; Exhibit I, pp. 6 and 7; Crisafulli Dec. ¶ 11.  Beyond that, Hillside LP apparently misled its accountants as to when its obligation to make principal payments on this loan would begin.  *See* Crisafulli Dec. ¶ 12.  Since Hillside's financial statements were available to Suburban, Suburban must have known of this deception.

Monthly real estate escrow payments by Hillside LP, as required by 24 C.F.R. §§ 200.84(b)(3) and 200.84(c), were also to begin on August 1, 1999.  As with the principal and reserve for replacements payments, did not require Hillside LP to make these escrow payments prior to January 2003.  Email from Nguyet Pham, Exhibit I, p. 11.  In 1999, Hillside LP, with help from Suburban, secured the release of escrow funds for the purpose, *inter alia*, of making principal payments and paying real estate taxes.  Crisafulli Dec. ¶ 8. But these funds were not used for these purposes.

Suburban did not seek HUD's permission to permit Hillside LP to forego any of these payments, so all three defaults continued for *three and one half years*.  *See* Richards Dec., ¶¶ 23-24; Nguyet email, Exhibit I, pp. 5, 9, and 11.  Astoundingly, Suburban's failure to accumulate borrower funds in an escrow account for real estate taxes continued *even after the City of Providence notified Suburban on April 20, 2000 (and thereafter on April 17, 2001 and April 2, 2002) that the real estate taxes on this project had never been paid*.  *See* Nguyet email, Exhibit I, pp. 11-12.

Mr. Richards says that a lender may *request HUD approval* to suspend deposits to the reserve for replacement account and to defer payments of principal to help a troubled borrower reinstate a defaulted loan.  *See* Richards Dec., ¶ 18, citing Handbook 4350.4, CHG-7, ¶ 2-42. Although HUD's approval was *not* requested in this case, he tries to minimize this failure.[14]  *Id.* But HUD approval is not a formality.  *HUD is the party at risk in these loan transaction*s, so workouts require HUD's involvement.  *See* Declaration of Beverly J. Miller ("Miller Dec."), Exhibit J, ¶ 5-8.  Moreover, permitting the borrower to pay real estate taxes directly is not a permissible workout strategy under any circumstances, even with HUD approval.  *See* Handbook 4350.4, CHG-7, ¶ 2-42; Miller Dec. ¶ 6.

HUD learned of the defaults described above in January 2003.  Crisafulli Dec., ¶ 11.  On April 10, 2003, Hillside LP submitted a proposal to gradually make up the deficit in the reserve for replacements account.  Knowing that the project was incapable of making up this deficit immediately, HUD approved this request. *See* Exhibit G, attachment 13.  Nevertheless, when Suburban elected to assign the loan to HUD in May 2004, it reported that the reserve for

---

[14]  Richards represents in his declaration that Suburban's failure to request HUD's approval was an "administrative oversight."  Richards Dec., ¶ 16.  However, Nguyet Pham stated in his email that "Suburban does not know why the request was not filed."  Exhibit I, p. 4.

replacements account remained deficient.  Miller Dec., attachment 1.  Contrary to paragraph 26

of Mr. Richards' declaration, HUD never orally approved payment of the unamortized principal

at final endorsement.[15]  Crisafulli Dec., ¶ 9.

HUD's Office of Inspector General ("OIG") began an audit of Suburban in 2003.

Declaration of Cristine O'Rourke ("O'Rourke Dec."), Exhibit E, ¶ 2.  A report (the "Audit

Report") summarizing the audit's findings is attached to Ms. O'Rourke's declaration as

attachment A.[16]  OIG auditors examined five HUD-insured mortgage loans made by Suburban to

nursing homes in Rhode Island between 1994 and 1998.[17]  The following table summarizes those

five loans:

| Project | Loan Amount | Endorsed | Result |
|---|---|---|---|
| Coventry Health Center | $15,308,700 | May 1994 | Borrower defaulted; mortgage assigned; HUD net loss $6,292,920 |
| Edmund Place Health Center | 9,147,900 | June 1995 | Borrower defaulted; mortgage assigned; HUD net loss $7,711,154 |
| Hillside Health Center | 12,979,300 | Aug. 1998 | Out of business; election to assign mortgage denied |
| Mount Saint Francis Health Center | 8,616,900 | July 1995 | Financially troubled[18] |
| Riverview Nursing Home | 11,068,700 | Nov. 1996 | In operation |

A common feature of these projects is the interest held by Antonio Giordano in each of

them.  Those interests are described in the Audit Report, Appendix C.  In addition, Giordano and

---

[15]  Any such approval would, in any event, need to be in writing.  See Jayson Investments, Inc. v. Kemp, 746 F. Supp. 807, 813-15 (N.D. Ill. 1990).

[16]  The Audit Report is styled as a draft because it is being sent to the audited entity and HUD for comment.  The OIG General Counsel has approved its use in this litigation.

[17]  Hillcrest Village, the borrower on the sixth loan examined in the audit, is not a nursing home.

[18]  This project has been designated as "high risk" because of its low score on HUD's OPIIS financial risk ranking.  In addition to the HUD-insured first mortgage, there is an operating loss loan in the principal amount of $1,103,600 in second position.  *See* Crisafulli Dec. ¶ 3.

his immediate family own a series of companies that received substantial payments from all of these nursing homes.  *See* O'Rourke Dec., ¶ 6.  In 2001 alone, Hillside Health Center, LLC paid identity-of-interest entities at least the following amounts.[19]  *See* Crisafulli Dec., attachment 5:

| **Entity** | **Amounts Paid by Hillside** |
| --- | --- |
| Sterling Health Care Management Co., LLC | $ 97,982.00 |
| Management Realty Services, Inc. | 4,932.08 |
| My Place, Inc. | 40,376.00 |
| Antonio L. Giordano | 45,729.40 |
| Consultants, Inc. | 171,757.00 |
| Consultants Associates, Inc. | 42,500.00 |
| Coventry Health Center | 7,128.00 |
| Coventry Sewage Associates | 1,900.00 |
| Mount Saint Francis Health Center | 77,838.36 |
| Edmund Place Health Center | 20,151.60 |
| Gregory Building Company | 141,976.46 |
| Simon & Windsor Interiors, Inc. | 2,446.00 |
| Construction Software, Inc. | 72,320.00 |
| Hillside Health Center Personal Needs Account | 94,101.24 |

---

[19]  According to HUD Handbook 4381.5, REV-2, ¶ 2.3.b, an "IOI [identity-of-interest] relationship exists when an individual or entity that provides management services to the project has a relationship with the project owner that is such that selection of the management fee will not be determined through an arms-length transaction.
(1) An IOI relationship exists when:  a. The owner entity or general partner of the owner entity, or b. Any officer or director of the owner entity, or  c. Any person who directly or indirectly controls 10 percent or more of the voting rights or owns 10 percent or more of the owner entity <u>is also</u>, d. An owner, general partner, officer, or director of the management agent company or its subcontractor, <u>or</u> e. A person who directly or indirectly controls 10% or more of the voting rights, or owns 10 percent or more of the management company or its subcontractor."

Hillside Health Center, LP (non-mortgage)                    83,428.66

**TOTAL         $904,566.80**

Thus, at a time when Hillside LP, owned by Giordano, was in default for failing to pay principal, reserve for replacement contributions, and tax escrows because, allegedly, it was unable to do so, Suburban, also owned by Giordano, took no steps to prevent Hillside LLC to pay over Nine Hundred Thousand Dollars in one year to identity-of-interest entities controlled by Giordano.[20]

Suburban's choice to let Hillside LLC and LP ignore their financial obligations burdened these entities with additional expense, even beyond the monies paid out to these identity-of-interest entities.  The OIG audit found that Hillside's failure to pay real estate taxes in a timely manner ultimately cost the nursing home $229,673 in interest charges.  Audit Report, p. 11-12.  In addition, the failure to amortize principal increased the total amount of interest owed monthly on the insured loan.[21]

On the basis of facts described above, and a similar pattern of abuse found in the other Suburban identity-of-interest loans in Rhode Island, the OIG auditors concluded that:

> Suburban Mortgage failed to perform its fiduciary responsibilities for HUD-insured loans totaling $62.8 million. Suburban Mortgage
> • Allowed its executive vice president to approve HUD-insured loans for properties in which he had an ownership interest without properly disclosing the extent of the relationship.
> • Paid the executive vice president for loan originations on HUD-insured loans for properties in which he had an ownership interest.
> • Provided misleading and confusing information to HUD regarding identity-of-interest relationships involving Suburban Mortgage, selected mortgagors, and other related entities.

---

[20]  Thus, even apart from Mr. Giordano's own knowledge of these payments, which can be attributed to Suburban, Suburban cannot claim that it was ignorant of them.

[21]  Under the terms of its agreement with its GNMA investor, Suburban was not required to make payments of principal to the investor until after final endorsement, which never occurred on this loan.  See, Prospectus for Ginnie Mae I, Pool No. 378032CL, attached as Exhibit L.

• Did not detect improper cash distributions by identity-of-interest owners of
properties receiving HUD-insured loans and notify HUD accordingly.
• Failed to notify HUD of an identity-of-interest mortgagor's failure to pay the
mortgage principal, required reserve for replacements deposits, and real estate
taxes.
These conditions occurred because the management of Suburban Mortgage
ignored prudent business practices and failed to follow proper management
controls. As a result of these conditions, Suburban Mortgage
(1) Cannot assure HUD of its compliance with applicable federal regulations,
(2) Caused HUD a $14 million loss due to two defaulted loans that Suburban
Mortgage originated for its identity-of-interest companies,
(3) Permitted a HUD-insured property to incur $229,673 in unnecessary penalties,
and
(4) Increased HUD's risk of loss on the remaining three HUD-insured loans
totaling $25.8 million.

Audit Report, p. 7.

During 2004 a federal grand jury was empaneled in Providence to investigate the

transactions in the audit report; the Department of Justice has advised Suburban that it is a target

of that investigation.

The OIG audit uncovered an agreement (the "Compensation Agreement") between Mr.

Giordano and Mr. Richards, dated February 3, 1993. O'Rourke Dec., attachment C. Under this

Compensation Agreement, Suburban was to pay Consultants (Giordano's wholly owned

company and the general partner of Hillside LP) "packaging and processing fees" on loans

arranged in "Rhode Island and neighboring states" in a sliding scale amount based on a

percentage of the mortgage amount. Additional fees were to be paid out equally to Richards and

Giordano. In response to a request from HUD's Mortgagee Review Board, Suburban's counsel

in this action provided further information about this agreement. *See* Letter from Timothy A.

Vanderver, Jr. to David E. Hintz, February 3, 2005, Exhibit M. According to Mr. Vanderver, the

Compensation Agreement was terminated effective January 1, 1995 on the advice of Suburban's

auditors, but compensation continued to be paid thereafter according to its terms. In the case of

the Hillside loan (FHA Project No. 016-43092), Giordano received a fee of $162,241.50 and

Consultants received an additional fee of $129,793.00.  *Id.*, p. 3.

On March 3, 2004, Antonio L. Giordano and Consultants, Inc. petitioned the Superior

Court of the State of Rhode Island for appointment of a receiver for the Hillside Health Center,

invoking a form of state bankruptcy or insolvency proceeding.  Exhibit N-3.  On that same day,

the Court appointed Alan M. Shine of the law firm of Winograd, Shine & Zacks, P.C., as

temporary receiver of the property.  *See* Exhibit N-4.  The Order appointing Mr. Shine as

receiver enjoined all creditors and potential creditors from proceeding in any action against the

property, including in any judicial or non-judicial foreclosure, without permission of the Superior

Court.  *See* Exhibit N-4, ¶ 6.  If HUD were to accept Suburban's election to assign the Hillside

mortgage, this injunction would impair HUD's rights as a secured creditor under state law.

Thereafter, Mr. Shine was appointed as permanent receiver and the injunction against

foreclosures and other proceedings was continued.  *See* Exhibit N-1, Receivership Notice, ¶ 14.

Since his appointment, the receiver for Hillside Health Center has received proofs of

claim from a variety of Hillside creditors.  A listing, prepared by the receiver, of claims filed

through January 12, 2005, shows a claim for taxes and other assessments from the City of

Providence in the amount of $615,994.46, a claim from the Internal Revenue Service in the

amount of $3,991,149.44, a claim from the Rhode Island Department of Labor and Training in

the amount of $118,312.49, and claims from the Rhode Island Division of Taxation in two

amounts of $377,322.84 and $199,512.39.  *See* Exhibit G, attachment 14.   Contrary to its

obligation under 24 C.F.R. § 201.41(a), Suburban has not filed a proof of claim in the

receivership.  On December 6, 2004, the Rhode Island Superior Court gave the Hillside receiver

authority to sell the Hillside Health Center free and clear of all liens.  *See* Richards Dec. ¶ 40.

On May 12, 2004, Suburban elected to assign the Hillside loan to HUD.  As required by 24 C.F.R. § 200.121, Suburban filed this election electronically, and an email confirmation was automatically generated.  *See* Miller Dec., ¶ 11 and attachment 1.   Although the monthly payment required under the loan amounted to approximately $12-13,000,[22] and no principal payments had been made for a period of more than four and one half years, Suburban certified in its election of assignment that only $13,090.59 of the loan amount was then in default.  *See* Miller Dec., attachment 1.  On December 21, 2004, Ms. Beverly Miller, Director of HUD's Office of Asset Management, responded to Suburban's attempted election in a letter that raised a number of issues, including the question of fraud and misrepresentation.  *See id.*, attachment 2.  In a letter dated January 5, 2005, an attorney for Suburban responded to "HUD's claim … suggesting fraud or misrepresentation by Suburban."  *See id.*, attachment 3, p. 3.  On April 29, 2005, then Assistant Secretary of Housing and Federal Housing Commissioner John A. Weicher rejected Suburban's attempted election.  *See id..*, attachment 4.   Mr. Weicher explained:  "Your election is rejected on the ground of fraud or material misrepresentation committed by Suburban Mortgage Associates Incorporated, as well as on other grounds relating to the terms of the contract."

## III.   ARGUMENT

### A.   <u>This Court Lacks Jurisdiction To Hear This Disguised Contract Claim</u>.

In <u>United States v. White Mountain Apache Tribe</u>, 537 U.S. 465, 472 (2003) the Supreme Court recently noted that  "[j]urisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity … together with a claim falling

---

[22]  The loan required a level monthly payment and a fixed interest rate, but the principal balance varied as drawdowns were made.  Thus, the principal payment shown above is necessarily an approximation.

within the terms of the waiver."  See also United States v. Mitchell, 463 U.S. 206, 212 (1983)

("It is axiomatic that the United States may not be sued without its consent and that the existence

of consent is a prerequisite for jurisdiction.")

In this case Suburban relies on the waiver of sovereign immunity provided by the

Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq.[23]  It is true that the APA has

"broaden[ed] the avenues for judicial review of agency action by eliminating the defense of

sovereign immunity in cases covered by" its provisions.  Bowen v. Massachusetts, 487 U.S. 879,

891-92 (1988).  But the waiver of sovereign immunity under the APA is limited.  See, Bowen,

487 U.S. at 904, n.39.  The APA waives sovereign immunity for suits to "set aside agency action

… found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."  5 U.S.C. § 706(a), but only when the suit demands "relief other than money damages."  Id.

And the APA waiver applies only if "there is no other adequate remedy in a court..." 5 U.S.C.

§ 704. Emphasis added.  Bowen, 487 U.S. at 902.  The Tucker Act, 28 U.S.C. § 1491(a),

provides an adequate remedy for claims that an agency of the United States has breached a

contract.  Only the Court of Federal Claims has jurisdiction to hear suits under the Tucker Act

when the claimed amount is in excess of $10,000.  28 U.S.C. § 1491(a)(1).

There is, therefore, no jurisdiction in this Court to hear a suit under the APA if that suit

is, in reality, a suit for breach of contract in which the plaintiff is attempting to get money out of

the Government.  Wisconsin Electric Power Co. v. Department of Energy, 211 F.3d 646, 648

(D.C. Cir. 2000) ("The Court of Federal Claims, not this court, is the proper forum for

adjudicating contract disputes."); Deaf Smith County Grain Processors, Inc. v. Glickman, 162

F.3d 1206, 1210-1211 (D.C. Cir. 1998) (Court of Federal Claims "provides an 'adequate

---

[23]  Neither the Declaratory Judgment Act nor 28 U.S.C. § 1331 waive the sovereign immunity of
the United States.

remedy' … which would preclude district court jurisdiction under § 704 of the APA");

Consolidated Edison Co. v. United States, 247 F.3d 1378, 1384 (Fed. Cir. 2001) (refund remedy

in Court of Federal Claims held to be adequate remedy barring district court action under the

APA); Christopher Village, L.P. v. United States, 360 F.3d 1319 (Fed. Cir. 2004) (district court

lacked jurisdiction to grant declaratory judgment construing the law concerning a HUD

regulatory agreement because Tucker Act remedy was adequate).

     As explained above, the relationship between HUD and its insured lenders is contractual.

Suburban readily admits this fact.  In a demand letter sent to HUD the month before it filed this

lawsuit, its counsel in this case (Mr. Vanderver) complained that actions by the Office of General

Counsel were "causing HUD to breach its contractual obligation under its contract of insurance

with Suburban."  Richards Dec. (in plaintiff's papers), attachment 13.  Similarly, in its initial

complaint in this action, Suburban labeled its second cause of action as "Breach of Contract."  It

is also clear that the gravamen of Suburban's lawsuit is the payment of contract damages.  In the

Prayer for Relief of its First Amended Complaint (¶ B) it asks to be awarded, "an amount to be

proven at trial, including, but not limited to, the $1,468,626.25 in payments made by Plaintiff

since the Mortgagor's default[.]" This case is about money that Suburban claims to be

contractually owed by HUD, nothing more or less than that.

     Of course, Suburban has attempted to plead around this problem because it prefers to be

in this Court.  Other plaintiffs have done the same, and been rebuffed both in this Circuit and

elsewhere.  In Kidwell v. Department of Army, Bd. for Correction of Military Records, 56 F.3d

279, 284 (D.C. Cir. 1995), our Court of Appeals held that:

> The plain language of a complaint … does not necessarily settle the question of
> Tucker Act jurisdiction.…  This is because plaintiffs can bypass Tucker Act
> jurisdiction by converting complaints which "at their essence" seek money
> damages from the government into complaints requesting injunctive relief or

declaratory actions.  Because this forum shopping circumvents a primary purpose of the Act--to ensure that a central judicial body adjudicates most claims against the United States Treasury, *see* United States v. Hohri, 482 U.S. 64, 71-73, 107 S. Ct. 2246, 2251-52, 96 L.Ed.2d 51 (1987) (describing goal of uniformity behind creation of Federal Circuit); Vietnam Veterans of America v. Secretary of the Navy, 843 F.2d 528, 534 (D.C.Cir.1988) (recognizing the Tucker Act's interest in uniformity)….  To enforce this prohibition on the creative drafting of complaints, we look to the complaint's substance, not merely its form. *See, e.g.,* Amoco Prod. Co. v. Hodel, 815 F.2d 352, 361 (5th Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S. Ct. 2898, 101 L.Ed.2d 932 (1988).  Absent other grounds for district court jurisdiction, a claim is subject to the Tucker Act and its jurisdictional consequences if, in whole or in part, it explicitly or "in essence" seeks more than $10,000 in monetary relief from the federal government.

See Transohio Savings Bank v. Office of Thrift Supervision, 967 F.2d 598, 613 (D.C. Cir. 1992) (APA jurisdiction to grant declaratory relief in cases where a Tucker Act remedy is available limited to those "few cases where a Claims Court remedy is 'so inadequate that the plaintiff would not be justly compensated.'").

Other courts have reached the same conclusion.  See Coggeshall Development Co. v. Diamond, 884 F.2d 1, 4 (1st Cir. 1989) (action for breach of contract remains "an action for breach of contract, irrespective of how it is packaged"); Brazos Electrical Power Co-op, Inc. v. United States, 144 F.3d 784, 787 (5th Cir. 1998) (claim for monetary damages cannot be converted into a claim for declaratory relief through "artful pleading"); Randall v. United States, 95 F.3d 339, 346 (4th Cir. 1996) ("[R]eview under the APA is available only for 'final agency action *for which there is no other adequate remedy in a court*' … [T]o determine whether Plaintiff's suit is cognizable under the APA, the court must first examine whether he has an available remedy under the Tucker Act.") (emphasis in original); Metadure Corp. v. United States, 490 F. Supp. 1368, 1372 (S.D.N.Y. 1980) (plaintiff "may not, by the simple expedient of lumping its contract claims together and denominating them a constitutional violation, escape the procedural limitations of the Tucker Act").

In this case there can be no question that Suburban's alleged past and prospective losses, were it to prevail, would be fully compensable in money.  This remains true even if, as Suburban may urge, it were to go entirely out of business as a result of the action that HUD has taken.  Its consequential damages would be recoverable.  See, *e.g*., <u>Energy Capital Corporation v. United States</u>, 302 F.3d 1314 (Fed. Cir. 2002) (new business which failed permitted to collect prospective profits as consequential damages).  Accordingly, Suburban's Tucker Act remedy is entirely adequate, and this Court is without jurisdiction to adjudicate this matter.

Finally, a further limitation on Suburban's right to proceed in this Court can be found in the APA itself.  Count I of its First Amended Complaint purports to seek relief under § 706(a)(2) of the APA, it seeks to set aside HUD's denial letter as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  But the only relief available under this subsection of the statute is, as the statute provides, the "set[ting] aside" of agency action.  Setting aside the denial letter would not give Suburban the relief it seeks.

Count II of Suburban's First Amended Complaint seeks what amounts to mandamus against HUD, an injunction to compel the agency to take a particular action which has been withheld, namely the acceptance of Suburban's election to assign the mortgage on the Hillside Health Center to HUD.  This action, if it were available to Suburban, should properly be brought under § 706(a)(1) of the APA, as an action to "compel agency action unlawfully withheld…."  To issue the injunction requested here, this Court must find that HUD "has violated its statutory mandate by failing to act" in the manner sought by Suburban.  <u>See</u> <u>Environmental Defense Fund, Inc. v. Costle</u>**,** 657 F.2d 275 (D.C. Cir. 1981).  This is a higher standard than the arbitrary and capricious standard – this Court must find that HUD was compelled by law to act.  Since Suburban agrees that it is barred from assigning a mortgage to HUD if it has committed fraud or

misrepresentation, the order sought by Suburban is beyond the scope of relief available to it under the APA.

### B.   Suburban's Motion For A Preliminary Injunction Should Be Denied.

Even if this Court were to find that it has jurisdiction in this case, Suburban's motion for a preliminary injunction should be summarily denied.  Both mortgage insurance contracts and the scheme hatched here to circumvent the safeguards built into those contracts are complex. Nevertheless, within the compass of this memorandum, HUD will make it clear that there is no basis for granting preliminary relief on these claims and these facts.

The decision of whether to grant preliminary injunctive relief under Federal Rule of Civil Procedure 65(a) is reserved to the sound discretion of the Court.  The Court's exercise of this discretion is subject to the admonition of the Supreme Court that an injunction should issue only when the intervention of a court of equity "is essential in order effectually to protect property rights against injuries otherwise irremediable."  Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982).  It is well settled that injunctive relief is an extraordinary remedy, and the party seeking it has a substantial burden of proof.  American Coastal Line Joint Venture v. United States Lines, Inc., 580 F. Supp. 932, 935 (D.D.C. 1983); see also Sea Containers Ltd. v. Stena AB, 890 F.2d 921, 925 (D.C. Cir. 1989); Virginia Petroleum Jobbers Assn. v. Federal Power Commission, 259 F.2d 921, 925 (D.C. Cir. 1958).  To be entitled to the extraordinary remedy of injunctive relief, plaintiff must show that:  (1) there is a substantial likelihood of prevailing on the merits of their claims; (2) a preliminary injunction is necessary to prevent irreparable injury; (3) the threatened injury to the plaintiff outweighs the potential harm to others; and (4) the public interest favors issuance of the injunction.  Sea Containers, 890 F.2d at 1208; Washington Metropolitan Area Transit Commission v. Holiday Tours, 559 F.2d 841, 843 (D.C. Cir. 1977);

Virginia Petroleum, 259 F.2d at 924-25.  These factors interrelate on a sliding scale and must be balanced against each other.  Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1318 (D.C. Cir. 1999).

Plaintiff's claim for relief in this action is brought under the waiver of sovereign immunity provided by the APA, 5 U.S.C. § 701, *et seq*.  In challenging an agency's decision under that act, a plaintiff must demonstrate that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This is a narrow standard of review, under which the Court may not substitute its judgment for that of the agency.  See, e.g., Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); see also Head Start Family Educ. Program, Inc. v. Cooperative Educ. Serv. Agency 11, 46 F.3d 629, 633 (7th Cir. 1995).  As long as the decision is based on the relevant factors, and there is no clear error of judgment, the agency decision must be affirmed.  "Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute . . .  not simply because the court is unhappy with the result reached."  Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87 (1983), citing Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978).

     **1.**       **Suburban Is Unlikely to Prevail Because It Secured this Contract of Mortgage Insurance through Fraud.**

Suburban admits that, if it committed fraud or misrepresentation in connection with the contract of insurance here at issue, it is not now entitled to receive the benefits of that insurance contract.  Memorandum of Points and Authorities in Support of Plaintiff's Motion for Temporary Restraining Order And/Or Preliminary Injunction ("Plaintiff's Memorandum"), at 2.  This

unqualified admission is entirely consistent with the case law.  In <u>Jayson Investments, Inc. v. Kemp</u>, 746 F. Supp. 807 (N.D. Ill. 1990), the court held that the Secretary could not be compelled to proceed to final endorsement of a policy of insurance where the insured lender had engaged in a misrepresentation of material fact.  The court emphasized that NHA § 203(e) was to be read in the disjunctive, with *either* fraud or the misrepresentation of a material fact being sufficient to bar the plaintiff's recovery; it held that a misrepresentation of a material fact could occur even in the absence of intent.  746 F. Supp. at 818-819.  See, to the same effect, <u>Jay F. Zook, Inc. v. Brownstein</u>, 237 F. Supp 800, 807-08 (N.D. Ohio 1965).  <u>Jayson</u> involved a misrepresentation that occurred in connection with the initial formation of the contract of insurance; however, insurance claims against HUD are also barred where fraud or misrepresentation occurs in connection with the claim.  <u>See</u> <u>United States v. Miller</u>, 645 F.2d 473, 477 (1981).

### a.       Only Suburban's Intent Is At Issue Here.

The elements of fraud are well known.  Our Court of Appeals has held that:

> Fraudulent misrepresentation requires proof of  "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." <u>Hercules & Co., Ltd. v. Shama Restaurant Corp.</u>, 613 A.2d 916, 923 (D.C.1992).

<u>Chedick v. Nash</u>, 151 F.3d 1077, 1081 (D.C. Cir. 1998).[24]  The <u>Chedick</u> court explained that a misrepresentation of a party's present intent to perform a future act is actionable in fraud:

---

[24]  The law in other jurisdictions is essentially the same.  <u>See, e.g.</u>, <u>Unitherm Food Systems, Inc. v. Swift Eckrich, Inc.</u>, 375 F.3d 1341, 1358 (Fed. Cir. 2004), giving the elements of common law fraud as:  "(1) a representation of material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his reliance on the misrepresentation."

Because the alleged tortfeasor must have misrepresented either his current intent to perform or his existing knowledge concerning the likelihood that an event would occur in the future, the tort of promissory misrepresentation is consistent with the general rule that an erroneous representation of future events is not tortious. *See* 37 Am.Jur.2d, Fraud and Deceit, § 68 (1968) ("The gist of the fraud in such cases is not the breach of the agreement to perform, but the fraudulent intent of the promisor, the false representation of an existing intention to perform where such intent is in fact nonexistent, and the deception of the obligee by such false promise.").

151 F.3d at 1081.  For these reasons, "[a] promise or contractual commitment may be actionable as a misrepresentation if at the time of its making the promisor had no intention of carrying it out." Id., at 1082, citing Day v. Avery, 548 F.2d 1018, 1026 n. 39 (D.C.Cir.1976), which cited William Prosser, *Torts* § 109 at 729-30 (4th ed.1971)).

In the case at bar all elements of promissory fraud are present.[25]  The existence of most of these elements is beyond dispute.  In executing the Mortgagee's Certificate, Suburban promised HUD that it intended "to conform with and abide by such HUD regulations in all matters with respect to the aforesaid loan and the project in so far as they are applicable to us."  Mortgagee's Certificate, ¶ 14.

HUD clearly relied on this representation when it endorsed the mortgage note and thereby extended mortgage insurance to the Hillside project:  HUD could not have extended mortgage insurance to Suburban unless it promised to adhere to HUD's regulations and directives.  See 24 C.F.R. § 200.51.  Because it could not close the loan without securing this promise, the promise was undoubtedly material.  Further, as the Audit Report shows, Suburban's failure to comply with HUD's regulations and directives has had calamitous consequences for HUD's mortgage insurance fund in other projects, and has potentially calamitous consequences

---

[25]  It appears that some jurisdictions refer to this as "promissory fraud" while others call it "promissory misrepresentation."  Since the NHA repeatedly refers to fraud *and* misrepresentation  (see NHA §§ 203(e) and 2(g)), the distinction is not relevant for present purposes.  See Jayson, *supra*.

in this one.  This is not to mention the calamitous consequences that Suburban's failure to abide

by its promise to act as a prudent lender may have caused the residents of the Hillside Health

Center.

The *only* remaining question is whether Suburban intended to keep its promises at the

time they were made, or already knew at that time that it would not keep them.  Since this Court

cannot examine the minds of Suburban's officers and directors at a time past, this question can

only be answered by relying on circumstantial evidence.  Williamson v. Busconi, 87 F.3d 602,

603 (1st Cir. 1996) (fraudulent intent must be inferred from the "totality of the circumstances,"

including "post-transaction conduct and consequences"); Beijing Metals & Minerals

Import/Export Corporation v. American Business Center, 993 F.2d 1178, 1185 (5th Cir. 1993)

(fraudulent intent not to perform a promise "may be shown by circumstantial evidence, including

the subsequent conduct of the promisor"); In re Carey, 938 F.2d 1073 (10th Cir. 1991)

(fraudulent intent "may be established by circumstantial evidence, or by inferences drawn from a

course of conduct"); Farmers Co-operative Association v. Strunk, 671 F.2d 391 (10th Cir. 1982)

(fraudulent intent may be shown from circumstantial evidence of a course of conduct, including

subsequent conduct).  See also In re Guy, 101 B.R. 961 (Bankr. N.D. Ind. 1988); Comerica Bank

v. Weinhardt (In re Weinhardt), 156 B.R. 677, 680 (Bankr. M.D. Fla. 1993).  See Waltree Ltd. v.

Ing Furman Selz LLC, 97 F. Supp. 2d 464, 468 (S.D.N.Y. 2000) ("To demonstrate an inference

of fraudulent intent, a plaintiff must allege either (1) motive and opportunity to commit fraud; or

(2) circumstantial evidence of conscious misbehavior or recklessness.")

> **b.      Suburban Never Intended To Abide By Its Promises.**

The facts in this case lead to the inevitable conclusion that Suburban *never intended* to

abide by any regulation, directive, requirement, or promise that would interfere with its owners'

ability to make money.  Several lines of evidence lead to this conclusion.  Consider first that, from the 1998 loan closing through its election in early 2004 to assign the Hillside mortgage to HUD, Suburban systematically violated *every single regulation and promise described in section I A of this memorandum*.

● Suburban paid commissions on the loan transaction to both Giordano and Consultants, even though such payments were clearly prohibited by 24 C.F.R. § 202.5(l).

● Contrary to 24 C.F.R. § 200.84(b)(1), Suburban did not require Hillside LP to make principal payments on the first day of each month beginning on August 1, 1999, as required by the "amortization plan agreed upon by the mortgagor, the mortgagee and the Commissioner."

● Contrary to 24 C.F.R. § 200.84(b)(3), Suburban did not require Hillside LP to make monthly payments in any amount into an escrow account maintained by Suburban for the purpose of paying taxes, charges, and special assessments.  In violation of 24 C.F.R. § 200.84(c), Suburban allocated Hillside's payments as interest, even when it was paying nothing into the escrow account for taxes, fees, and special assessments.

● Contrary to Handbook 4350.4, CHG-7, ¶ 2-14a, Suburban did not make escrow disbursements before the real estate taxes on Hillside became delinquent.  Instead, even after it *knew* that the taxes had become delinquent it did not begin to compel Hillside LP to make escrow payments.   At least $119,000 of real estate taxes owing to the City of Providence were still delinquent as of the date that Suburban elected to assign the mortgage, and constituted a lien on the property that was superior to the HUD-insured mortgage.  *See* Miller Dec., Attachment 1, (Martell letter) p. 2.

● Contrary to 24 C.F.R. § 202.5(e) and paragraph 13 of its Mortgagee's Certificate, Suburban did not require Hillside LP to make monthly deposits into the reserve for replacements

account.  That account was still deficient on the date of Suburban's attempted election in the amount of $116,332.03.  *See* Miller Dec., Attachment 1.

- In violation of 24 C.F.R. § 232.850(a), Suburban did not report the defaults represented by Hillside LP's failure to pay principal, reserve for replacements, or tax escrow amounts within 30 days of the date of the first non-payment, *i.e.*, by August 31, 1999 at the latest.  In fact, Suburban did not report these defaults for at least three and one half years.  Moreover, Suburban permitted these defaults to continue even after it was – *by its own account* – fully aware of them.

- Suburban failed to escrow real estate taxes even after it became aware that real estate taxes were not being paid.

- Contrary to 24 C.F.R. § 232.875, Suburban did not elect to assign the Hillside mortgage to HUD within 75 days of the date of default.  And contrary to the representation it made in the Rider to the Mortgagee's Certificate, Suburban did not seek a three-month extension of that 75-day deadline.

- In all the ways described above, Suburban violated the requirement imposed by 24 C.F.R. § 202.5(j)(4) that it conform to the generally accepted practices of prudent lenders and avoid practices that demonstrate irresponsibility and the special requirement imposed by 24 C.F.R. § 201.41(a) that it service the Hillside loan in accordance with the accepted practices of prudent lending institutions.  Suburban violated its fiduciary duty to HUD.

- When it elected to assign the Hillside mortgage to HUD, Suburban warranted that no act or omission on its part had impaired the validity and priority of the HUD-insured mortgage.  24 C.F.R. § 207.258(b)(2)(i) and (ii).  Prior to that date, Giordano, who was Suburban's Executive Vice President, director and co-owner, and Consultants, which was Suburban's

processor and packager, had already filed their petition for the appointment of a receiver to take

over the Hillside Center, in violation of the Regulatory Agreement, and the Rhode Island

Superior Court had already granted that petition and enjoined any foreclosure of the property

without consent of the Court.  These actions clearly "impaired" the "validity and priority" of

HUD's lien.  In addition, the remaining real estate tax lien (described above) in the amount of

$119,112.13 impaired the validity and priority of the mortgage.

● Suburban continues to violate the obligation imposed upon it by 24 C.F.R. § 201.42(a)

that it file a proof of claim in any bankruptcy or insolvency proceeding relating to the property.

Given the profound completeness of Suburban's violation of these regulations, promises,

and requirements, only three inferences are possible: (1) Suburban's officers and directors are

utterly incompetent; (2) someone in Suburban's corporate structure made a long series of

horrible mistakes; or (3) Suburban and Giordano intended from the beginning to ignore their

obligations to HUD.  The first two of these theories are implausible; all of the evidence points to

the third.

To begin with, Suburban's officers and directors do not appear incompetent.  As noted

above, Mr. Richards "has been a mortgage lender almost exclusively dealing in the FHA-insured

multifamily market since 1969[.]"  Richards Dec., ¶ 4.  Suburban now receives "virtually 100%

of its business from FHA-insured loans."  Richards Dec., ¶ 3.  By his own declaration, Mr.

Richards is knowledgeable of the HUD insurance program and of the various requirements

applicable to Suburban's contract of insurance with HUD.  *See* Richards Dec. ¶¶ 5, 6, 7, 8, 14,

18, 29, and 32.   The notion that Suburban's Executive Vice President, Mr. Giordano, is

incompetent is equally implausible.  He owns and operates over a dozen businesses in

Providence, all of which depend on the HUD loan guarantee program.  Nor is Suburban's third

director, a principal in a large Washington law firm, likely to be found incompetent or asleep at the switch.

Second is the highly implausible possibility of a long series of horrible mistakes by someone in Suburban's corporate structure, mistakes that went unreported to management.  To begin with, Suburban only has seven employees.  See O'Rourke Dec., attachment B.  Nguyet Pham, the Treasurer of Suburban, is responsible for loan servicing.  Id.  He has been Treasurer of Suburban since 1995.  See Exhibit O.  He was still Treasurer of Suburban in February 2004, long after Suburban allegedly learned of its failures to comply with its obligations to HUD.  See Richards Dec., attachment 5.   If Suburban's Treasurer had really made the egregious errors that Suburban claims, it is safe to assume that he would no longer be Suburban's Treasurer.

Although Suburban wants to rely on the bureaucratic mistake theory, its explanation does even achieve the relatively low standard of internal consistency.  It cannot decide whether it "does not know" why requests for HUD approval were not filed" (Exhibit I, at p. 4), or whether it knows that these requests were not filed as the result of "an administrative oversight."  See Richards Dec., ¶ 16.  It is undeniable that Suburban has no detailed, plausible explanation of what happened.  Moreover, a single "administrative oversight" falls laughingly short of the breadth and depth of "mistakes" necessary to explain away Suburban's failings.

The only remaining possibility is that Suburban and Giordano intended from the very beginning to avoid compliance with HUD's regulations and directives, and with their own promises, whenever that was convenient for them.  This theory is most consistent with the facts. It explains, for example, why Suburban was always willing to ignore requirements imposed for HUD's benefit, but assiduous in taking actions that protected its own position.  For example, it has regularly paid the monthly interest and GNMA guarantee fees that it is required to make on

its GNMA mortgage backed security.  It continued to make these payments after Hillside closed

in order to protect its own interest.  <u>See</u> Richards Dec., ¶¶ 22 and 36.  Failure to make these

payments would lead to extinguishment of Suburban's rights in all mortgages that back GNMA-

guaranteed securities.

Moreover, since Suburban always understood that its actions would increase the risk of

the Hillside Health Center's final collapse, it always paid its mortgage insurance premiums to

HUD.  <u>See</u> Exhibit I, pp. 12-13.  No "administrative oversight" ever occurred when it came to

protecting Suburban's interests.

Suburban's actions in this matter comported with the interests of its co-owner, Mr.

Giordano.  Mr. Giordano profited immensely from this transaction.  He and Consultants received

commissions from Suburban for bringing in the loan amounting to $292,034.50.  But far beyond

this commission, Mr. Giordano and his immediate family regularly received identity-of-interest

payments from Hillside Health Center – over $900,000 in 2001 alone.   This pattern of lender

and borrower working together in their own self-interest instead of serving the interests of HUD

and of the residents of the Hillside Health Center suggests that another promise that Suburban

made was also broken, and intended to be broken:  That is its promise that this would be an

"arms length transaction."  Exhibit G, attachment 7, Rider.  Upon reviewing the facts at issue

here (but without knowledge of the identity of the parties) the Office of the Commissioner of

Financial Regulation for the State of Maryland, the state regulator for Suburban, determined that

these transactions were not at "arms length."  Audit Report, at 13.

The theory that this was a fraud from the start is consistent with Suburban's decision not

to report Hillside LP's failure to make principal, reserve for replacement, and real estate escrow

payments for *three and one half years*.  As explained in the Declaration of Beverly Miller, had

HUD been aware of these defaults, it would have intervened to prevent them from continuing. One method of intervention would have been to insist on the assignment of the mortgage in a timely manner, and to follow that up by foreclosing on the property.  See Miller Dec. ¶ 9.  But this kind of robust HUD intervention would have surely meant that Mr. Giordano could no longer pay himself hundreds of thousands of dollars a year for "services" performed on behalf of the nursing home.  Seen as concealment and not as mere oversight, Suburban's failure to report these defaults makes perfect sense.

In the context of this motion for a preliminary injunction challenging an agency decision under the APA, the burden is on the plaintiff to show that HUD's finding of fraud in this case was wrong.  On the record presented, Suburban simply cannot make that showing.

> **2.      Suburban Is Unlikely To Prevail Because It Was Not Contractually Entitled to Assign the Hillside Mortgage.**

Suburban's multiple failures and defaults, recounted above, are elements of the fraud that permeates this transaction.  They are also breaches of contract.  This section will discuss certain of those breaches in more detail.

Suburban seeks a declaration that, under NHA § 232, 12 U.S.C. 1715w, HUD was legally required to "accept" its proffered assignment of the Hillside mortgage, and an injunction requiring HUD to pay the what it claims to be the insured amount of $12,979,300 and Suburban's alleged damages subsequent to the date, which it wishes to prove at trial.  However, Suburban is not contractually entitled to any of this relief.

Section 232 of the NHA authorizes the Secretary of HUD "to insure any *mortgage* (including advances on such mortgage during construction) in accordance with the provisions of this section upon such terms and conditions as he may prescribe... [emphasis added]."  12 U.S.C. § 1715w(c).  The statute defines "mortgage" as the "first mortgage on real estate in fee simple[.]"

12 U.S.C. § 1715w(b)(4).  It defines the term "first mortgage" as "such classes of first liens as are commonly given to secure advances (including but not being limited to advances during construction) on, or the unpaid purchase price of, real estate under the laws of the state, in which the real estate is located[.]"  *Id.*[26]  12 U.S.C. § 1713(g) authorizes the payment of a mortgage insurance claim for a mortgage in default "upon assignment, transfer and delivery to the Secretary, within a period and in accordance with rules and regulations to be prescribed by the Secretary of (1) all rights and interests arising under the mortgage so in default[.]" In other words, upon the transfer of all rights and interests arising under the "first mortgage" in default (along with a series of other items required by the statute and further described in 24 C.F.R. § 232.885(b)(1)(v)).

When HUD insured this mortgage, the lien of Suburban's mortgage on the Hillside Health Center property was a "first lien on real estate."  On March 3, 2004, Antonio L Giordano, Suburban's Executive Vice President and co-owner, along with Consultants, Inc., Suburban's "processing and packaging" firm, filed a joint Petition for Appointment of Receiver in the Superior Court of Rhode Island.  See Exhibit N-3.  Based on this petition, the Court appointed a receiver and authorized him to take possession of the assets and property of Hillside Medical Center property, including the insured property.  See Exhibit N-4.  As noted above, this action immediately impaired HUD's rights under the insured "first mortgage," because it was accompanied by an order prohibiting any foreclosure without the permission of the Court.

Along with Hillside's other creditors, Suburban received notice of the receivership.  See Exhibit N-1.  A hearing was scheduled on the Receiver's Petition For Instructions Regarding Borrowing on a Secured Priority Basis, and Marketing of Real Estate and Other Assets Free and

---

[26]  An essentially identical definition is contained in NHA § 207(a)(1), 12 U.S.C. § 1713(a)(1).

Clear of Liens, and on December 2, 2004, the Court issued an Order instructing the receiver to market and sell all of Hillside's assets "free and clear of all mortgages, security interests, liens, claims, encumbrances and interests, including, but not limited to the existing mortgage and security interests, with the liens to transfer to the proceeds of said sale." See Exhibit N-2.

Although Suburban had ample notice of the receivership proceeding, it has never filed a proof of claim to protect its mortgage and priority lien interest in the property. See Exhibit G, attachment 14. On the other hand, $11 million in other creditor claims have been filed.[27] Id. Among these, the City Collector of the City of Providence filed a proof of claim for real estate taxes in the amount of $615,944.40. See Exhibit N-6. As a result of these actions, the HUD-insured first lien on the Hillside property has been impaired.

Suburban filed its Notice of Assignment electronically on May 12, 2004, over two months after its co-owner and packager filed the Petition for Appointment of a Receiver. Suburban is not now entitled to assign the mortgage under the contract of mortgage insurance because it cannot "assign, transfer or deliver" the rights and interests arising under the first mortgage that HUD initially endorsed for insurance.[28]

Finally, this loan has not gone to final endorsement under 24 C.F.R. § 200.47(a). HUD has, therefore not certified the reasonableness of those expenditures. It is clear that some of the money withdrawn by Suburban from HUD-mandated escrow accounts did not go where it was supposed to go. It is not beyond the realm of possibility that some money provided by Suburban/Giordano to Suburban/Hillside did not go where it was supposed to go either. In short,

---

[27] These creditor claims, most of them obviously legitimate, may explain why Giordano created this receivership. If some of these creditors were aggressively pursuing Mr. Giordano, the receivership would stop them. Suburban would not wish to take any action that would be contrary to his interest.

[28] Suburban's attempt to assign this impaired mortgage may also constitute a misrepresentation made in the claim for assignment.

even if HUD were obligated to accept Suburban's election of assignment, it would not be obligated to pay Suburban's claim as stated.

### 3.   Suburban Is Unlikely to Prevail Because It Was Not Deprived of Due Process.

At various points in its First Amended Complaint, Suburban claims that HUD deprived it of due process by not affording it a hearing before rejecting its election of assignment.  But this branch of Suburban's argument fails on several grounds.  First, nothing in the National Housing Act or in HUD's regulations requires HUD to give Suburban with either a notice or a hearing before rejecting its election.  Second, Suburban has not asked this Court to compel HUD to grant it a hearing and does not want this Court to compel HUD to grant it a hearing.  See First Amended Complaint, Prayer for Relief.  Instead, it wants to have its hearing in Court.  It wants to prove up its damages at trial.

HUD agrees that Suburban is entitled to go to Court over the amount of damages, if any, that it suffered as the result of HUD's action.  The Court it should go to, however, is the Court of Federal Claims.  See Section I, *supra*.  In that Court it will be free to raise any arguments of fact and law that it could have raised at an administrative hearing had an administrative hearing been required.  It will, moreover, have broader discovery than it could possibly have in an administrative context or on an expedited hearing.

An entitlement to due process does not necessarily entitle a plaintiff to *pre-deprivation* due process.  Twenty-five years ago, the Supreme Court in Parratt v. Taylor, 451 U.S. 527, 540 (1981), *overruled in part on other grounds,* Daniels v. Williams, 474 U.S. 327 (1986), made clear that the "fundamental requirement of due process is the opportunity to be heard and it is an "'opportunity which must be granted at a meaningful time and in a meaningful manner.'" However, the Court went on to recognize that, "meaningful time" and "meaningful manner" do

not always mean that a hearing must be afforded prior to the initial deprivation of property.  See, to the same effect, Washington Teachers' Union Local # 6 v. Board Of Education, 109 F.3d 774 (D.C. Cir. 1997) (teachers *not* entitled to predeprivation hearing prior to termination of employment).  A post-deprivation right to be heard has also been held to be adequate in the context of IRS property seizures.  Commissioner of Internal Revenue v. Shapiro, 424 U.S. 614, 630 n. 12 (1976).

In this case, what difference would it have made if HUD had afforded Suburban a hearing before deciding to deny the election?   Suburban is seeking money to be *paid money by HUD*. Even if HUD had given Suburban notice of its proposed decision prior to taking it and had provided a quasi-judicial forum in which Suburban could have contested HUD's proposed decision, *HUD certainly would not have paid the contested funds over to Suburban until that hearing had been completed*.  Suburban would still have needed to present its case to get the money it seeks.  It is in no different position now.

This is not a case where the government is taking property away from a person, or depriving a person of the benefits of an ongoing employment relationship.  In this case, the government has allegedly breached a contract to pay money.  Suburban is clearly entitled to due process in pursuing that money, but it is not entitled to get the money first and the process later.

### 4.    Suburban Has Not Shown That It Will Suffer Irreparable Injury.

"The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."  Wisconsin Gas Co., 758 F.2d at 674.  To constitute irreparable harm, "the injury must be both certain and great; it must be actual and not theoretical."  Id.  The burden is particularly difficult to meet in the procurement context, which is analogous to this case, where the courts consistently hold that agency discretion must be given particular force.

E.g., Sea-Land Serv., Inc. v. Brown, 600 F.2d 429, 434 (3d Cir. 1979); M. Steinthal & Co. v. Seamens, 455 F.2d 1289, 1301, 1304 (D.C. Cir. 1971).  In general, compensable economic loss does not constitute irreparable injury. [29]  Sampson v. Murray, 415 U.S. 61, 90 (1974); Wisconsin Gas Co., 758 F.2d at 674; Carabillo v. ULLICO, Inc. Pension Plan & Trust, 355 F. Supp. 2d 49, 55-56 (D.D.C. 2004).  See also Vencor Nursing L.P. v. Shalala, 63 F. Supp. 2d 1 (D.D.C. 1999) (monetary loss alone accorded little or no weight in analyzing irreparable harm); Nichols v. A.I.D., 18 F. Supp. 2d. 1 (D.D.C. 1998) (loss of job and salary without more insufficient to demonstrate entitlement to injunctive relief).

Plaintiff's request for preliminary relief—based on financial harm—should be summarily rejected by this Court for the simple reason that Plaintiff did not bother supporting its assertions with audited financial statements or balance sheets that one would  normally and appropriately expect from a multi-million dollar enterprise, much less one that is required to file audited financial statements annually with HUD as a condition of its participation in the mortgage insurance program, see 24 C.F.R. § 202.7(b)(4).  The financial information that Plaintiff does bother to provide is highly selective, does not appear to be audited, and is not presented through someone, such as an accountant, who has any colorable claim to objectivity or independence. Any relief based on such a record, much less the extraordinary relief of a preliminary injunction, should be rejected out of hand.

---

[29]  When a party alleges economic injury, the fact that it bases its legal theory of recovery upon a claim of constitutional right does not transform the harm suffered into irreparable injury sufficient to support preliminary injunctive relief.  See, e.g., National Leased Housing Association v. Cisneros, D.D.C., Civ. Action No. 95-1242 (NHJ), August 11, 1995 (opinion attached as Exhibit G), at 5, citing Christ Gatzonis Electrical Contractor v. New York City School Construction Authority, 1993 WL 262715 (E.D.N.Y. July 2, 1993); Transohio Saving Bank v. Director, OTS, 1991 U.S. Dist. LEXIS 11877, *27 (D.D.C. July 31, 1991), aff'd., 967 F.2d 598 (D.C. Cir. 1992).

Even if the Court were to grant the preliminary injunction, there is little assurance that Plaintiff would remain solvent and operational because much of the alleged harm appears to come from sources other than HUD's denial of the election of assignment, such as Suburban's allegedly lower than expected revenues.  This case presents none of the unusually extraordinary equitable reasons that have justified preliminary relief in other cases involving financial harm.

It is also true that Plaintiff has done nothing to explain the difference between what it ultimately seeks in relief and what it seeks in preliminary relief.  It request for preliminary relief should be dismissed as moot, if it is distinguishable at all from its request for ultimate relief, because HUD acted on its Election of Assignment by denying it.  Plaintiff has made no apparent attempt to modify its request for preliminary relief since that action by HUD, and this provides yet another reason, sufficient by itself, to deny Plaintiff's request for preliminary relief.

### 5.   The Threatened Injury to Plaintiff, Potential Harm to Others, and Public Interest all Disfavor Preliminary Injunction.

Suburban's injury, whatever it is, is compensable, financial harm.  Even according to Plaintiff's skimpy financial information, Hillside's financial condition is not otherwise hale and healthy but for HUD's allegedly improper withholding of the insurance coverage of the monthly mortgage payments.  This is not the extraordinary preliminary injunction case where financial harm justifies preliminary relief.  It is instead, at best, an otherwise routine contract action, dressed up as an emergency due to Plaintiff's alleged financial condition and the timing of its lawsuit.  At the same time, however, the Government faces a clear risk in paying money into Suburban with little assurance that it could recover the money if HUD prevails in this lawsuit.

Moreover, it is also clear that Plaintiff seeks ultimate relief through the vehicle of a preliminary injunction, and the nature of the financial issues raised herein make it abundantly clear that preliminary relief on such a record is neither appropriate nor necessary.  In sum, the

public interest is not served by throwing good money after bad, and certainly not on the basis of the evidence presented by Plaintiff here.

## IV.   <u>Conclusion</u>

Plaintiff's entire case should be dismissed for lack of jurisdiction because it miscasts its contract claims as APA claims and the governing case law look past the form of the complaint to the substance of the underlying claim, which Plaintiff itself agrees is a contract claim.  As for the request for preliminary relief, Plaintiff's claims come nowhere near satisfying any of the four required elements.  Instead, Plaintiff's pleading of financial exigency, in combination with its attempt to expand the scope of the expedited hearing, boil down to an attempt to force the agency to defend a complicated contract claim on an impossibly short timetable.  Therefore, even if the Court found that it had jurisdiction, the request for preliminary relief should be denied.


May 13, 2005                                    Respectfully submitted,


                                                _____
                                                KENNETH L. WAINSTEIN, D.C. Bar # 451058
                                                United States Attorney


                                                _____
                                                R. CRAIG LAWRENCE, D.C. Bar # 171538
                                                Assistant United States Attorney


                                                _____
                                                ALAN BURCH, D.C. Bar # 470655
                                                Assistant United States Attorney
                                                555 4th St., N.W.
                                                Washington, D.C. 20530
                                                (202) 514-7204
                                                alan.burch@usdoj.gov

                                                Of Counsel:

                                                Carole W. Wilson
                                                Associate General Counsel

Angelo Aiosa
Assistant General Counsel

William C. Lane
Senior Trial Attorney
U.S. Department of Housing and Urban Development
451 Seventh Street, S.W., Room 10258
Washington, D.C. 20410
(202) 708-0300

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
SUBURBAN MORTGAGE ASSOCIATES,          )
INCORPORATED,                          )
                                       )
    Plaintiff                          )
                                       )          Civ. Action 05-856 (HHK)
    v.                                 )
                                       )
UNITED STATES DEPARTMENT OF            )
HOUSING AND URBAN DEVELOPMENT,         )
ET AL.,                                )
                                       )
    Defendants                         )
_____)

## FEDERAL DEFENDANTS' MOTION TO DISMISS

    Defendants in this case, the U.S. Department of Housing and Urban Development;

Alphonso Jackson, Secretary of Housing and Urban Development; the Federal Housing

Administration; and John Weicher, Assistant Secretary for Housing/Federal Housing

Commissioner, respectfully move to dismiss this case for lack of subject matter jurisdiction,

pursuant to Rule 12(b)(1).  Plaintiff brings a contract action in this case, albeit one that Plaintiff

presents as based on the Administrative Procedure Act.  Under the relevant statutes and case law,

the substance of the claim controls over the presentation in the complaint and exclusive

jurisdiction lies with the U.S. Court of Federal Claims, not this Court.

    A memorandum and supporting exhibits are attached hereto, and these also serve as

Defendants' opposition to Plaintiff's request for a preliminary injunction.


May 13, 2005               Respectfully submitted,


                         _____
                         KENNETH L. WAINSTEIN, D.C. Bar # 451058
                         United States Attorney

_____
R. CRAIG LAWRENCE, D.C. Bar # 171538
Assistant United States Attorney


_____
ALAN BURCH, D.C. Bar # 470655
Assistant United States Attorney
555 4th St., N.W.
Washington, D.C. 20530
(202) 514-7204
alan.burch@usdoj.gov

Of Counsel:

Carole W. Wilson
Associate General Counsel

Angelo Aiosa
Assistant General Counsel

William C. Lane
Senior Trial Attorney
U.S. Department of Housing and Urban Development
451 Seventh Street, S.W., Room 10258
Washington, D.C. 20410
(202) 708-0300