## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SUBURBAN MORTGAGE
ASSOCIATES, INC.
                    **Plaintiff**
          v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT, et al.,
                    **Defendants**

**Civil Action 05-00856 (HHK)**

## MEMORANDUM OPINION AND ORDER

Plaintiff, Suburban Mortgage Associates, Inc. ("Suburban"), brings this action against the

United States Department of Housing and Urban Development ("HUD"), and one of its

subagencies, the Federal Housing Administration ("FHA"). Suburban, a commercial mortgage

lender, obtained FHA insurance coverage for a mortgage loan it issued to a nursing home in

Providence, Rhode Island. After the borrower defaulted, Suburban elected to assign the

mortgage to HUD. After nearly a year of inaction, HUD rejected the assignment on grounds of

fraud or material misrepresentation. Suburban now seeks declaratory and injunctive relief that

would require HUD to accept the assignment of the mortgage and pay insurance proceeds to

Suburban, and also seeks review of HUD's determination that it engaged in fraud or

misrepresentation.

Presently before the court are defendants' motions to dismiss for lack of subject matter

jurisdiction [#22], or in the alternative to transfer the case to the Court of Federal Claims [#45],

and Suburban's motions for a preliminary injunction [#3] and for production of the

administrative record [#38].[1]  Upon consideration of the parties' briefing, the accompanying

submissions, and the argument of counsel at a preliminary injunction hearing, the court

concludes that defendants' motion to dismiss must be granted in part and denied in part;

defendants' motion to transfer must be denied; plaintiff's motion for a preliminary injunction

must be denied; and plaintiff's motion to produce the administrative record must be granted.

## I. BACKGROUND

### A.     HUD's Mortgage Insurance Program

The National Housing Act ("NHA"), 12 U.S.C. §§ 1701 *et seq.*, authorizes HUD to insure

mortgage loans, and empowers the Secretary of HUD "to insure as hereinafter provided any

mortgage offered to him which is eligible for insurance as hereinafter provided, and, upon such

terms as the Secretary may prescribe, to make commitments for the insuring of such mortgages

prior to the date of their execution and disbursement thereon." *Id*. § 1709(a).  The FHA is the

component of HUD responsible for implementing the NHA's mortgage insurance program.[2]  *See*

*id*. § 1708.  HUD may insure mortgages which, among other purposes, are issued for the

development of nursing homes, intermediate care facilities, and "assisted living facilities for the

care of frail elderly persons." *Id*. § 1715w(a).[3]

_____

[1] Suburban has also moved to submit a reply brief to its motion for a preliminary injunction [#27] in excess of the 25-page limit specified by LCvR 7(e).  The court grants this motion, and deems filed the 31-page reply brief Suburban submitted with its motion.

[2] For ease of reference, this opinion uses "HUD" to refer collectively to HUD and the FHA, although separate references to "the Secretary" (of HUD) and "the Commissioner" (of the FHA) remain.

[3] The provisions of subsections (d), (e), (g)–(l), and (n) of 12 U.S.C. § 1713 "shall apply" to federally-insured mortgages issued for nursing homes, intermediate care facilities, and assisted living facilities. *Id*. § 1715w(f).

To be eligible for mortgage insurance, the mortgage must "[h]ave been made to, and be held by, a mortgagee approved by the Secretary as responsible and able to service the mortgage properly." *Id*. § 1709(b)(1).  In addition, HUD may specify "terms and provisions with respect to insurance, repairs, alterations, payment of taxes, default, reserves, delinquency charges, foreclosure proceedings . . . and other matters as the Secretary may in his discretion prescribe." *Id*. § 1709(b)(7).

Once HUD has approved an application for insurance, "a commitment shall be issued by the Commissioner setting forth the terms and conditions upon which the mortgage will be insured." 24 C.F.R. § 200.46.  Before HUD issues insurance coverage, the mortgagee "shall certify to the Commissioner that it will conform with terms and conditions established by the Commissioner for the mortgagee's control of project funds."  *Id*. § 200.51.  HUD then "indicate[s] the insurance of the mortgage by endorsing the original credit instrument and identifying the section of the [NHA] and the regulations under which the mortgage is insured and the date of insurance."  *Id*. § 200.100(a).   This step is referred to as 'initial endorsement,' as opposed to 'final endorsement,' which occurs only "[w]hen all advances of mortgage proceeds have been made and all the terms and conditions of the commitment to the Commissioner's satisfaction," at which point HUD again endorses the credit instrument.  *Id*. § 200.100(b).  Both HUD and the lender are "bound from the date of initial endorsement . . . by the provisions of the Contract Rights and Obligations" set forth in 24 C.F.R. pt. 232.  *Id*. § 200.100(c).

Mortgage lenders may opt to sell or retain loans they originate.  If a lender retains a loan, it must "service or arrange for servicing of the loan." *Id.* § 202.5(e).  Lenders must "service loans in accordance with accepted practices of prudent lending institutions"; must "have

adequate facilities for contacting the borrower in the event of default, and shall otherwise

exercise diligence in collecting the amount due"; and "remain responsible to [HUD] for proper

collection efforts, even though actual loan servicing and collection may be performed by an agent

of the lender." *Id*. § 201.41(a).  Additionally, a lender receiving HUD mortgage insurance may

also issue securities in the amount of the mortgage and then sell them to investors.  Another

component of HUD, the Government National Mortgage Association ("GNMA"), 12 U.S.C. §

1717(a)(2)(A), is authorized to "guarantee the timely payment of principal of and interest on such

trust certificates or other securities" that the lender may issue.  *Id*. § 1721(g)(1).

A default on the mortgage occurs upon the "failure of the mortgagor to make any

payment due under or provided to be paid by the terms of a mortgage insured under [the NHA],"

*Id*. § 1713(g); *see also* 24 C.F.R. § 232.830(a).  If the default continues for a period of 30 days,

the lender becomes entitled to receive the benefits of the mortgage insurance.  12 U.S.C. §

1713(g); 24 C.F.R. § 232.830(c).  If the borrower's default is not cured within the 30-day grace

period, the lender must then notify the FHA Commissioner of the default in writing, within an

additional 30-day period.  *Id*. § 232.850.

Upon the continuation of a default for 30 days, the lender has the option of either

assigning the mortgage to HUD, or else proceeding to foreclosure.  12 U.S.C. § 1713(g); 24

C.F.R. § 232.865.  If electing assignment, "the mortgagee shall be entitled to receive the benefits

of the insurance . . . upon assignment, transfer, and delivery to the Secretary" of rights and

interests arising out of the mortgage; claims of the lender arising out of the mortgage

transactions; "all policies of title or other insurance or surety bonds or other guaranties and any

and all claims thereunder"; any remaining balance on the mortgage loan not advanced to the

borrower; cash or property held by the lender as deposits made by the borrower; and records relating to the mortgage transactions. 12 U.S.C. § 1713(g). The lender may alternately "proceed to foreclosure on and obtain possession of" the mortgaged property, and receive benefits of the insurance upon the "prompt conveyance to the Secretary of title to the property"; and assignment to the Secretary of all claims of the lender arising out of the mortgage transaction or foreclosure proceedings, "except such claims as may have been released with the consent of the Secretary." *Id*. If the lender intends to file a claim for the benefits of the loan insurance, it must file a claim "within 45 days after the lender becomes eligible for the benefits of the loan insurance, or within such later time as may be agreed upon by the Commissioner in writing." 24 C.F.R. § 232.875.

Finally, the NHA provides that once the lender files a claim according to the specified procedures and within the requisite deadlines, HUD in most cases must accept the election of assignment:

> any contract of insurance . . . executed by the Secretary under this subchapter shall be conclusive evidence of the eligibility of the loan or mortgage for insurance, and the validity of any contract of insurance so executed shall be incontestable in the hands of an approved financial institution or an approved mortgagee from the date of the execution of such contract, *except for fraud or material misrepresentation* on the part of such approved financial institution or approved mortgagee.

12 U.S.C. § 1709(e) (emphasis added).

**B.      The Hillside Mortgage**

Suburban sought to originate a mortgage loan in the amount of $12,979,300 to Hillside Health Care Associates ("Hillside Associates")[4] to fund the purchase and rehabilitation of the

---

[4] HUD identifies two separate (though closely interrelated) Hillside entities: Hillside Health Care Associates, L.P., the owner of the Hillside nursing home; and Hillside Health Center L.L.C., the lessee-operator of the nursing home. *See* Crisafulli Decl. ¶ 4. HUD states that Antonio Giordano is the owner of Hillside L.L.C., *id*., as well as the sole limited partner

former Jewish Home for the Aged in Providence, Rhode Island.  Am. Compl. ¶ 12.  Suburban

applied to HUD for insurance coverage on the loan on December 10, 1997.  Defs.' Mot. to

Dismiss/Opp'n to Prelim. Inj. ("Mot. to Dismiss"), Ex. D ("Crisafulli Decl.") ¶ 4.  HUD

committed to insure the loan on June 29, 1998, *id.*, and the loan went to initial endorsement on

August 19, 1998.  Am. Compl. ¶ 12. Suburban used the loan to issue a GNMA mortgage-backed

security, which it then sold to an investor.  *Id.* ¶ 12.  Suburban also elected to retain and service

the Hillside mortgage.  Crisafulli Decl. ¶ 7.

Prior to the loan closing, Suburban executed a Mortgagee's Certificate setting forth its

responsibilities, including a provision that upon amortization of the principal, it would require

Hillside Associates to make monthly deposits into a "Reserve Fund for Replacements."

Withdrawals from this fund required written permission from HUD, which also mandated

"[n]otices of any failure to receive the required deposits" within 60 days.  Defs.' Mot. to Dismiss,

Ex. G, Attach. 7 ("Mortgagee's Certificate").  In addition to requiring Hillside Associates to

make interest and principal payments, HUD also required Suburban to provide for "[e]qual

monthly payments as will amortize the ground rents, if any, and the estimated amount of all

taxes, water charges, special assessments, and fire and other hazard insurance premiums."  24

C.F.R. § 200.84(b)(3).

---

of Hillside L.P.  Defs.' Mot. to Dismiss, Ex. E ("O'Rourke Decl.") ¶ 5(d), who also
controlled Consultants, Inc., the general partner of Hillside L.P. *Id.* ¶ 6(a).  Giordano is also a
"sometime principal of Suburban."  Pl.'s Reply at 6.

While distinctions between the two Hillside entities may prove consequential to the
ultimate resolution of this dispute, for purposes of the motions presently under consideration
the court simply refers to the entities collectively as "Hillside Associates" for the sake of
simplicity.

Under the terms of the mortgage note executed between Suburban and Hillside Associates on August 19, 1998, Hillside would pay interest only from September 1, 1998 through July 1, 1999.  On August 1, 1999, Hillside Associates would begin paying installments of both interest and principal, in the amount of $82,359.92 per month.  Defs.' Mot. to Dismiss, Ex. G, Attach. 8 ("Mortgage Note.").  The mortgage terms also required Hillside Associates to begin making payments into the reserve for replacements account and the escrow account on the same date.

Hillside Associates, meanwhile, received the necessary regulatory approval to begin operating a nursing home at the Hillside facility in April and May 1999.  Am. Compl. ¶ 14. Hillside, however, "struggled to fill enough beds to self-sustain the facility," *id*. ¶ 15, and Hillside Associates accordingly failed to make any of the required payments on August 1, 1999. *Id*. ¶¶ 18, 20.  Upon becoming aware of Hillside Associates' default, Suburban states that it "followed FHA prescribed guidance in an effort to avoid a default and an ensuing claim for mortgage insurance." *Id*. ¶ 20.  Specifically, Suburban allowed Hillside Associates to "suspend deposits to the reserve for replacement and to defer payments of principal until final endorsement," and required the borrower "to enter into payment plans with the City of Providence, Rhode Island to address delinquent real estate taxes." *Id*. ¶¶ 21, 23.  Suburban also "negotiated an arrangement" with the investor who purchased the GNMA-guaranteed security it issued in the amount of the Hillside mortgage "in order to give the Mortgagor more time to resolve its financial problems." *Id*. ¶ 25.

Suburban asserts that it "failed to obtain FHA's prior approval" before implementing the specified workout strategies due to an "administrative oversight." *Id*. ¶ 18. Because Suburban "was under the mistaken impression that the request for deferral of principal had already been made and approval had been granted from HUD, it did not believe that it was necessary to instruct the Mortgagor to start making principal payments," although it "informally pressed" Hillside Associates to begin making these payments. Def.'s Mot. to Dismiss, Ex. I at 7.

In HUD's view, though, Suburban simply failed to require Hillside Associates to make the principal payments or payments into the reserve for replacements fund at all, and "failed to report these defaults to HUD." Defs.' Mot. to Dismiss at 12. According to HUD, "Suburban did not seek HUD's permission to permit Hillside [Associates] to forego any of these payments, so all three defaults continued for three and one half years." *Id*. at 13 (emphasis omitted). HUD states that is first learned of the defaults in January 2003. Crisafulli Decl. ¶ 11. HUD also claims that Suburban used impermissible workout strategies in attempting to help Hillside Associates cure its default, such as allowing the borrower to pay real estate taxes directly. Defs.' Mot. to Dismiss, Ex. J ("Miller Decl.") ¶ 6. Sometime in 2003, HUD's Office of the Inspector General began an audit of Suburban after apparently discovering that it had originated HUD-insured mortgages to three defaulted nursing homes and one financially troubled nursing home. O'Rourke Decl., attach. ("Discussion Draft Audit Report") at 2. The draft audit report noted "significant irregularities in how Suburban Mortgage originated and serviced HUD-insured loans to related entities," and recommended that HUD pursue recovery "of more than $7.7 million in insurance losses" and "terminate the $25.8 million in HUD-insured loans" to the failed nursing homes, including Hillside. *Id*. at 3.

Not surprisingly, Suburban paints a different picture of its efforts. It claims that in January 2003 it "realized that it had not received the necessary FHA approvals to defer amortization of the mortgage note principal and to suspend payments to the reserve for replacement fund." Am. Compl. ¶ 26. On April 11, 2003, HUD approved Hillside Associates' request to begin making up the deficit in the reserve for replacements account, and extended the deadline for Hillside Associates' submission of a plan to achieve final endorsement on the mortgage. Defs.' Mot. to Dismiss, Ex. G, Attach. 13. Suburban claims that "HUD also orally approved payment of the unamortized principal at final endorsement," Am. Compl. ¶ 29, a contention HUD disputes. On January 21, 2004, HUD denied Suburban's request "to retroactively defer commencement of amortization of the [Hillside] mortgage and refused to proceed to final endorsement." *Id*. ¶ 31. After Hillside failed to make its March 1, 2004 loan payment, Suburban states that it notified HUD of the default. *Id*. ¶ 32.

On March 3, 2004, Antonio Giordano and Consultants, Inc. petitioned the Superior Court of the State of Rhode Island to appoint a receiver for the Hillside property. Defs.' Mot. to Dismiss, Ex. N-3. The Superior Court appointed Allan Shine on the same day as a temporary receiver, and made this appointment permanent on March 29, 2004. *Id*., Exs. N-4, N-5. The Court also enjoined all creditors from proceeding in any action against Hillside in the absence of a Court order authorizing them to do so. *Id*., Ex. N-4 ¶ 6. On December 6, 2004, the Superior Court authorized Shine to sell Hillside "free and clear of all mortgages, security interests, liens, claims, encumbrances and interests . . . ." Pl.'s Mot. For Prelim. Inj., Ex. A ("Richards Aff.") ¶ 40.

On May 12, 2004, Suburban elected to assign the Hillside mortgage to HUD. HUD contends that, because it "was aware of certain problems connected with [the Hillside] loan, as well as the HUD OIG audit and an accompanying grand jury investigation, "HUD took no immediate action on this election." Miller Decl. ¶ 12.  On December 21, 2004, HUD responded to Suburban's notice of election, noting that "we understand that there are numerous liens that may affect the priority of the lien covering the Hillside Health Center loan," and that "we cannot commence consideration of the acceptance of the assignment of the Hillside Health Center loan until you provide us with satisfactory evidence that the loan is a valid first lien and warrant in writing that no act or omission by you has impaired its validity."  *Id*., attach. 2.

An attorney representing Suburban replied to HUD on January 5, 2005, responding to various title issues, denying that Suburban committed any fraud or misrepresentation, contending that "HUD is improperly using a borrower default as a basis to deny coverage to an insured lender," and demanding that HUD accept Suburban's election of assignment. *Id*., attach 3. Suburban filed suit in this court on April 29, 2005, seeking a court order compelling HUD to accept its election.  That same day, then-FHA Commissioner John Weichert wrote to J. Walsh Richards, Jr., Suburban's president, stating that "[y]our election i[s] rejected on the ground of fraud or material misrepresentation . . . as well as on other grounds relating to the terms of the contract."  *Id*., attach. 4.

## II. ANALYSIS

### A.    Subject Matter Jurisdiction

Subject matter jurisdiction is a "threshold matter" for the court to resolve, because, in its absence "the court cannot proceed at all in any cause."  *Steel Co. v. Citizens for a Better*

*Environment*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)).

HUD contends that the court lacks subject matter jurisdiction over Suburban's suit because it is,

"in reality, a breach of contract suit in which the plaintiff is attempting to get money out of the

Government," Defs.' Mot. to Dismiss at 21, and therefore may only be heard by the Court of

Federal Claims.  Suburban responds that it is in fact seeking "specific relief" from HUD's

"unconstitutional, final agency action," Pl.'s Opp'n at 2,7, and is properly before this court.

When facing a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears

the burden of establishing the court's jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

561 (1992).  The court, however, should only dismiss a complaint on such grounds "if it appears

beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would

entitle [it] to relief."  *Richardson v. United States*, 193 F.3d 545, 549 (D.C. Cir. 1999) (quotation

omitted).

As an initial matter, "sovereign immunity shields the Federal Government and its

agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  To establish the court's subject

matter jurisdiction in an action against the United States, the plaintiff must identify "an explicit

statutory waiver" to federal sovereign immunity.  *Bancoult v. McNamara*, 227 F. Supp. 2d 144,

148 (D.D.C. 2002) (citing *Meyer*, 510 U.S. at 475; *Lane v. Peña*, 518 U.S. 187, 192 (1996);

*Galvan v. Fed. Prison Indus., Inc.*, 199 F.3d 461, 463-64 (D.C. Cir. 1999)).  The Administrative

Procedure Act provides a waiver of sovereign immunity for persons "adversely affected or

aggrieved by agency action within the meaning of a relevant statute," provided that such persons

are "seeking relief other than money damages."  5 U.S.C. § 702.  The APA is inapplicable,

however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief

which is sought." *Id*.  The APA also limits judicial review of agency action to situations where "there is no other adequate remedy in a court," *id*. § 704.  In sum, then, "the APA excludes from its waiver of sovereign immunity (1) claims for money damages, (2) claims for which an adequate remedy is available elsewhere, and (3) claims seeking relief expressly or impliedly forbidden by another statute." *Transohio Savings Bank v. Office of Thrift Supervision*, 967 F.2d 598, 607 (D.C. Cir. 1993).  The court next considers whether any of these three APA exclusions apply to Suburban's claims.

*1. Money Damages*

The first relevant exception to the APA is that the Act only waives sovereign immunity for suits "seeking relief other than money damages," 5 U.S.C. § 702.  Money damages are payments "intended to provide a victim with monetary compensation for an injury to the person, property, or reputation," as opposed to an equitable action for specific relief, "which may include an order providing for . . . the recovery of specific property or *monies*." *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 688 (1949)).  Money damages, then, may not simply be equated with 'money';"[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id*.  The difference lies in the purpose behind the payment sought, as damages are awarded to a plaintiff "to *substitute* for a suffered loss, while specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" *Maryland Dep't of Human Resources v. United States Dep't of Health and Human Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) (quoting D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES 135 (1973)).

Suburban seeks declaratory and injunctive relief setting aside HUD's determination of fraud or misrepresentation and ordering the agency to accept assignment of the Hillside mortgage. While Suburban has characterized its relief in injunctive, rather than monetary, terms, if it prevailed HUD would effectively be compelled to make monthly payments to Suburban's GNMA investor and to remit insurance premiums to Suburban. These payments, however, would not be made as compensation for the injury Suburban suffered as a result of HUD's actions; rather, they are payments that HUD would have been obligated to make all along had it, in Suburban's view, discharged its obligations. Accordingly, while Suburban thus clearly hopes to recover monies from HUD, this relief cannot properly be characterized as 'money damages.' Therefore, "the first limitation on the APA's waiver of the government's sovereign immunity is not a bar" to the court's exercise of jurisdiction. *Holly Sugar Corp. v. Veneman*, 355 F. Supp. 2d 181, 193 (D.D.C. 2005).

*2. Adequate Remedy*

This court's jurisdiction to review agency action is also limited to "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704. HUD argues that Suburban indeed has another adequate remedy in court, namely a suit for money damages in the Court of Federal Claims. Congress has provided the Court of Federal Claims with jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) ("Tucker Act"). Although the Tucker Act itself "contains no limitation on the type of relief it authorizes, the Act has long been construed as waiving

sovereign immunity only for claims seeking damages, and not for those seeking equitable relief,"

*Transohio*, 967 F.2d at 608 (citing *Richardson v. Morris*, 409 U.S. 464, 465 (1973) (internal

citation omitted); ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 9.2 at 488 (1989)).

Here, HUD contends that "there can be no question that Suburban's alleged past and

prospective losses, were it to prevail, would be fully compensable in money.  This remains true

even if, as Suburban may urge, it were to go entirely out of business as a result of the action that

HUD has taken."  Defs.' Mot. to Dismiss at 23.  HUD cites *Energy Capital Corp. v. United*

*States*, 302 F.3d 1314 (Fed. Cir. 2002), to support its contention that Suburban's remedies

available under the Tucker Act would be "entirely adequate."  Energy Capital, however, merely

sought to recover prospective profits allegedly lost as a result of HUD's breach of contract, not

injunctive relief, and accordingly initiated its suit in the Court of Federal Claims.  *See id.* at 1316,

1318–20.  *Energy Capital* provides no support whatsoever for HUD's proposition that a

company claiming that allegedly improper agency action will drive it out of business in the

absence of injunctive relief has an "entirely adequate" remedy in a suit for money damages.

Furthermore, while some of Suburban's claimed losses (such as insurance premiums or payments

to investors) may be easily reduced to a monetary sum, others may prove much harder to fix

(such as lost future profits), and yet others may prove nearly impossible to quantify (such as the

loss of the company's reputation or its employees' jobs).  Instead, Suburban's claim that its entire

existence as a going concern is threatened by agency action, "anticipates the need for injunctive

relief" and "it is doubtful that a simple money judgment . . . would be appropriate."  *Nat'l Ctr.*

*for Mfg. Scis. v. United States*, 114 F.3d 196, 201 (Fed. Cir. 1997).

Just as important, Suburban is looking to the court to provide equitable remedies; the

Court of Federal Claims, even if it ruled in Suburban's favor, could not provide the relief sought,

since "except for certain narrowly defined circumstances, [it] is prohibited from granting

equitable relief." *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279,

1294 (Fed. Cir.1999); *see also Massie v. United States*, 226 F.3d 1318, 1321 (Fed. Cir. 2000)

(Court of Federal Claims "had no authority" to order equitable remedy such as specific

performance). Suburban, then, does not have another "adequate remedy" in court which would

prevent the APA from waiving sovereign immunity with respect to its claims.

*3. Expressly or Impliedly Forbidden*

Finally, even if a plaintiff wishes to pursue claims seeking relief other than money

damages, and for which no other adequate remedy may be obtained in court, the APA will not

provide a waiver of sovereign immunity "if any other statute that grants consent to suit expressly

or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Under the Tucker Act, claims

based upon breach of contract "exceeding the $10,000 jurisdictional ceiling . . . are within the

exclusive jurisdiction" of the Court of Federal Claims. *Waters v. Rumsfeld*, 320 F.3d 265, 270

(D.C. Cir. 2003) (quoting *Goble v. Marsh*, 684 F.2d 12, 15 (D.C. Cir. 1982); and citing *United

States v. Hohri*, 482 U.S. 64, 72 (1987)).[5]

---

[5] The "assumption" that contract-based claims seeking more than $10,000 are within the
"exclusive jurisdiction" of the Court of Federal Claims "is not based on any language in the
Tucker Act granting such jurisdiction" to the Court. "Rather, that court's jurisdiction is
'exclusive' only to the extent that Congress has not granted any other court authority to hear the
claims that may be decided" by the Court of Federal Claims. *Bowen*, 487 U.S. at 910 n.48.
Under the "Little Tucker Act," "[t]he district court shall have original jurisdiction, concurrent
with the United States Court of Federal Claims, of . . . any other civil action or claim against the
United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any
Act of Congress, or any regulation of an executive department, or upon any express or implied

When applied to contract claims, the Tucker Act "impliedly forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, but also injunctive relief, which the Claims Court may not." *Transohio*, 967 F.2d at 609. The APA, therefore, "does not waive sovereign immunity for contract actions against the government," regardless of the relief sought. *Id*. To the extent that Suburban seeks an injunction ordering specific performance of a contract, then, this court may not hear such claims.

Suburban's complaint asserts two grounds for relief. First, Suburban argues that HUD and the FHA's "actions and belated conclusion, without support, that Plaintiff committed fraud or material misrepresentation violate Suburban's right to due process," Am. Compl. ¶ 51. Second, Suburban "seeks specific relief in the form of payment of the insured loan amount and the reimbursement of the exact payments it made," *id*. ¶ 58. This second count of Suburban's complaint, then, seeks an order requiring defendants to pay monies allegedly owed under the mortgage insurance agreement, essentially "the classic contractual remedy of specific performance." *Spectrum Leasing Corp. v. United States*, 764 F.2d at 891, 894 (D.C. Cir. 1985). Here, while it may well be requesting "specific relief," Suburban is simply asking the court to enforce the terms of its contract with HUD. Under *Transohio*, this court clearly lacks jurisdiction over such a claim.[6] *See also Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (court

---

contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort . . .". 28 U.S.C. § 1346(a)(2).

[6] The court declines to transfer this claim to the Court of Federal Claims; Suburban has not sought such a transfer. *Schrader v. Tomlinson*, 311 F. Supp. 2d 21, 26 n.4 (D.D.C. 2005).

"know[s] of no case in which a court has asserted jurisdiction either to grant a declaration that the United States was in breach of its contractual obligations or to issue an injunction compelling the United States to fulfill its contractual obligations.").

As for Suburban's remaining claim, HUD asserts that it sounds in contract; Suburban counters that it arises instead under the APA. The district court will not have jurisdiction "where a plaintiff casts his complaint as seeking equitable relief merely as a pretext in an attempt to avoid the Court of Federal Claims' exclusive jurisdiction." *Bublitz v. Brownlee*, 309 F. Supp. 2d 1, 7 (D.D.C. 2004) (citation omitted). At the same time, a court "will not find that a particular claim is one contractually based merely because resolution of that claim requires some reference to a contract." *Spectrum Leasing*, 764 F.2d at 893. The court must determine whether or not a claim is contractually based by examining its "substance rather than the form" of the complaint. *Bliss v. England*, 208 F. Supp. 2d 2,6 (D.D.C. 2002) (citing *Brazos Elec. Power Coop. v. United States*, 144 F.3d 784, 787 (Fed. Cir. 1998)). To properly undertake this evaluation, the court must consider "both the source of the rights upon which the plaintiff bases its claims" and the "type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

In *Megapulse*, the plaintiff corporation entered into a series of contracts with a federal government agency (the Coast Guard) for the demonstration and development of navigation transmitter technology. The parties' contracts included provisions that data first produced in performance of their agreement would become the property of the government, while all other data would remain the property of Megapulse. *Id*. at 961-62. After a dispute over the Coast Guard's release of data in which Megapulse claimed a proprietary interest, the company sought

an injunction to prevent the release of the information, which it claimed would violate the Trade Secrets Act.  The district court determined that it lacked subject matter jurisdiction over the suit because it was in essence a contract dispute properly adjudicated by the Court of Federal Claims. The D.C. Circuit disagreed, finding that while the plaintiff was seeking relief that would effectively hold the government in breach of contract, it was not specifically asserting its rights under the contract, but under a federal statute.[7]

HUD here argues that because its "only relationship with Suburban is a contractual one," Defs.' Reply at 2, Suburban's claim cannot be adjudicated in this court.  "All of Suburban's claims flow directly from" HUD's endorsement of the Hillside mortgage note on August 19, 1998, and "[w]ithout this endorsement, which formed the contract between Suburban and HUD, [Suburban] would have no claim at all against HUD."  Defs.' Reply at 2 (emphases omitted). This is an exceptionally broad construction of the requirement that a court examine "the source of the rights upon which the plaintiff bases its claims."  *Megapulse*, 672 F.2d at 968.  In

---

[7] The D.C. Circuit reached the opposite result in *Spectrum Leasing*.  In that case,  the plaintiff won a federal contract to develop a data communications network. After the company failed to provide an acceptable product to the government, though, the government invoked the contract's liquidated damages clause.  Spectrum sued, arguing that the APA waived sovereign immunity over its claim that in failing to perform on the contract the government violated the Debt Collections Act. 764 F.3d at 892.  The district court, and later the D.C. Circuit, disagreed with this proposition, finding that while the Debt Collections Act "might impose procedural requirements on the government having some impact on the contract, the Act in no way creates the substantive right to the remedy" the company sought, because "the gravamen of its complaint is that the government has breached the contract by wrongfully withholding payments due."  *Id*. at 894 & n.5.  In the present case, Suburban's claim seeking specific performance of the mortgage insurance contract suffers from the same defect.  In its remaining claim, however, Suburban is claiming something rather different— that HUD violated Suburban's due process rights not by failing to perform on the contract, but by the manner in which it determined that the company engaged in fraud or misrepresentation.

defendants' view, the simple fact that the parties first entered into their relationship through a contract renders Suburban's present claims entirely contractual and, hence, subject to the exclusive jurisdiction of the Court of Federal Claims.  Under this interpretation, though, the plaintiff in *Megapulse* could not have pursued its claim in district court either, simply because the transaction between the parties in that case also began with a contract.

A party "may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government." *Transohio*, 967 F.2d at 610 (citing *Sharp*, 798 F.2d at 1523).  In its remaining claim, Suburban does not seek a court order compelling HUD to abide by the terms of the insurance contact, but rather asks the court to find that HUD acted arbitrarily and capriciously in determining that Suburban committed fraud or misrepresentation.  Under this claim, Suburban argues that it was deprived of its right to due process by the manner in which HUD acted, a claim which "[is] not founded only on a contract" but which "stem[s] from a statute or the Constitution."  *Id*. at 609.

Suburban is incorrect, however, that "setting aside Defendants' conclusions will require HUD's acceptance of the assignment of the Hillside mortgage."  Pl.'s Opp'n at 8.  While this is quite obviously the outcome that Suburban desires, a review of HUD's agency action will not necessarily yield this result.  Rather, the court must consider whether the administrative record available to HUD at the time it decided to reject Suburban's assignment on the grounds of fraud or misrepresentation adequately supports that decision.  Accordingly, HUD shall file with the court a copy of the administrative record it relied upon in making its determination with respect to the election of assignment.

**B.      Preliminary Injunction**

Suburban also moves the court for a preliminary injunction[8] ordering HUD to accept

Suburban's assignment of the Hillside mortgage, and requiring the FHA to reimburse Suburban

for "for insurance proceeds owed as a result of a mortgage default."  Pl.'s Mot. for Prelim. Inj. at

2.  A preliminary injunction is an "extraordinary remedy." *Cobell v. Norton*, 391 F.3d 251, 258

(D.C. Cir. 2004) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  Factors the court

considers in determining whether a preliminary injunction should issue include whether "(1)

there is a substantial likelihood of success on the merits; (2) plaintiff will be irreparably injured if

an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the

public interest will be furthered by the injunction."  *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313,

(D.C. Cir. 1998) (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d

841, 843 (D.C. Cir. 1977)).

In this case, the court finds that Suburban has not met this considerable burden.  Most

significantly, Suburban has failed to demonstrate a likelihood of success on the merits.  The

injunction Suburban requests is identical to the relief it seeks on the merits.  The parties sharply

dispute many crucial material facts, including whether Suburban followed HUD's guidance,

whether Suburban sought to mislead HUD, and whether Suburban took adequate steps to

preserve the validity and priority of the Hillside mortgage.  In the face of these numerous

disputed facts, the court cannot conclude that Suburban has a likelihood of success, making a

preliminary injunction particularly inappropriate.

---

[8] Suburban initially sought a temporary restraining order, which the court denied on
May 2, 2005, to accomplish the same purpose.

### III. CONCLUSION

For the foregoing reasons, it is this 14th day of November, 2005, hereby

**ORDERED**, that defendants' motion to dismiss is **GRANTED** with respect to Count II of Suburban's complaint and **DENIED** with respect to Count I; and it is further

**ORDERED**, that defendants' motion to transfer and Suburban's motion for a preliminary injunction are **DENIED**; and it is further

**ORDERED**, that Suburban's motion to produce the administrative record is **GRANTED**.  Defendants shall file with the clerk of this court the administrative record underlying the decision at issue in this case by no later than November 28, 2005.


Henry H. Kennedy, Jr.
United States District Judge

21